BLEIDORN *v.* PILOT MOUNTAIN C. & M. COMPANY.

(*Knoxville.*    September 30, 1890.)

1. WILL, FOREIGN. *Passes land within this State, when.*

Foreign will operates, without recording or registration in this State, to pass any land here situated when such will has been executed and attested in the manner prescribed by our statutes, and duly proved and recorded in another State, the testator's domicile, under statutes identical with our own. (*Post, pp. 172, 173.*)

Code construed: § 3022 *et seq.* (M. & V.) ; § 2182 *et seq.* (T. & S.).

Case cited and approved: Smith *v.* Neilson, 13 Lea, 461.

2. SAME. *Effect of proving and recording in this State.*

Foreign will, upon being proved and recorded in this State, passes title to land here situated as of date of testator's death. Therefore the devisee may have such will proved and recorded after bringing suit for the land, and introduce it to support his title. (*Post, pp. 173, 174.*)

(See Code, § 3035 (M. & V.) ; § 2195 (T. & S.).

Cases cited and approved: Crockett *v.* Campbell, 2 Hum., 411; Brien *v.* O'Shaughnessy, 3 Lea, 725 ; Ward *v.* Daniel, 10 Hum., 607.

3. RES ADJUDICATA. *Decree for removal of cloud against unknown party upon publication. Jurisdiction.*

Decree for removal of cloud from title is void, and therefore not available as *res adjudicata* in a subsequent suit over the same land, between the same parties or their privies, where it is pronounced against "unknown" parties upon publication alone, which does not conform in material respects to the requirements of our statutes on that subject. The *Court's jurisdiction* depends, in such case, upon *strict compliance* with these statutes. (*Post, pp. 176–180.*)

Code construed: §§ 5095, 5096, 5101 (M. & V.); §§ 4352, 4353, 4358 (T. & S.).

Case cited and approved: Ferris *v.* Lewis, 2 Tenn. Ch., 291–295.

Cited and distinguished: 110 U. S., 151.

Bleidorn *v.* Pilot Mountain C. & M. Company.

4. SAME. *Same. Who are unknown parties.*

Defendants to bill who are not otherwise described therein than as "the heirs of L. Bleidorn," must be proceeded against as "unknown" parties. They are not *named* in the bill. (*Post, p. 178.*)

5. SAME. *Same. Publication for unknown party unauthorized, when.*

Publication for "unknown" defendants, based solely upon the averment supported by affidavit that they are *non-residents* of the State, is unauthorized and void, and confers no jurisdiction upon the Court over such parties. (*Post, pp. 178, 179.*)

6. SAME. *Same. What is essential to Court's jurisdiction over unknown defendants?*

It is essential to the Court's jurisdiction over "unknown" defendants, whether resident or non-resident, that publication for them should be based upon a sworn statement of the complainant, his agent or attorney, made in his bill or by separate affidavit, that their names are unknown, and "cannot be ascertained upon diligent inquiry." (*Post, pp. 178, 179.*)

7. STATUTE OF LIMITATIONS. *Seven years' adverse possession will not bar remainder-man's suit for land, when.*

Seven years' adverse possession of land, begun pending a life estate therein, does not bar the remainder-man's suit for the land brought within the saving of the statute (three years) after the falling in of the life estate.* (*Post, p. 174.*)

(See Code, § 3451 (M. & V.); § 2757 (T. & S.).

8. SAME. *Seven years' adverse possession bars remainder-man's suit for land, when.*

Seven years' adverse possession of land commenced before the inception of a life estate therein, and continued afterwards to make out the required period of seven years, bars the remainder-man's suit for the land brought at any time thereafter. (*Post, pp. 180, 197.*)

9. SAME. *Extent and effect of adverse possession.*

Adverse possession of land, held under color of title, extends to the boundaries therein described; but naked adverse possession is con-

---

* As the remainder-man is not "entitled to commence an action" until the termination of the life estate, it would seem the statute would not begin to run against him until that date, and therefore he could sue at any time within *seven years* thereafter. —REPORTER.

Bleidorn *v.* Pilot Mountain C. & M. Company.

fined to its actual, visible limits. When a small naked possession becomes part of a larger tract, claimed by the possessor or his privies under color of title, the extension of boundaries and possession occur at the· same instant. There is no relation of the extended to the date of the original possession.* (*Post, pp. 183, 184, 197.*)

10. CHAMPERTY. *Non-resident owner's sale of land adversely holden under decree or grant, void.*

Non-resident owner's "sale and conveyance" of lands situate in this State is champertous and void where they were, at date of sale, adversely holden under a *decree vesting title* or a *grant.* Lands thus holden are in "adverse possession by *deed,* devise, or inheritance" within meaning of our champerty laws. (*Post, pp. 194, 195.*)

Code construed: ₰2448 (M. & V.); ₰1779 (T. & S.).

Case cited and approved: Whiteside *v.* Martin, 7 Yer., 384.

11. SAME. *Bona fides that rebuts illegality of sale.*

The provision of our champerty laws that sales of lands held adversely shall be presumed champertous "until the purchaser shows such sale was *bona fide* made," is not satisfied by proof that the sale was in good faith as between the parties, but there must be proof that it was *bona fide* with reference to the provisions and policy of the champerty laws. (*Post, pp. 195, 196.*)

Code construed: ₰2449 (M. & V.); ₰1780 (T. & S.).

Case cited and approved: Gass *v.* Malony, 1 Hum., 452.

12. OUTSTANDING TITLE. *Defense of, available without special plea.*

Defense of outstanding title is available in action of ejectment without special plea. (*Post, p. 188.*)

(See Code, ₰3963 (M. & V.); ₰3239 (T. & S.); and Walker *v.* Fox, 85 Tenn., 155.)

13. SUPREME COURT PRACTICE. *Paper copied into transcript treated as part of record, when.*

A paper (an entry) copied into transcript will be treated as part of the record, though imperfectly certified, where there is no exception to

---

*A held adverse possession of one acre for three years. He then took deed for ten acres including the one. .He continued his possession within the óne acre for four years more. This invésted him with a possessory right for that acre, and to that extent his possession ceased to be wrongful. Did the possession on that acre thereafter operate as to the nine acres ?—REPORTER.

BLEIDORN VS. PILOT M'T COAL CO AND OTHERS

MORGAN COUNTY, TENN.

SCALE 250 P = 1 INCH.

(J.W.SCOTT, DEL. WARTBURG, TENN.)

its admission as evidence below, and no assignment of error upon it in this Court.   (*Post, p. 189.*)

(See Graham *v.* McReynolds, 88 Tenn., 241.)

14. LAND LAW.   *Priority of grant.*

Senior grant based upon junior entry prevails over junior grant based upon senior entry unless the latter entry is put in evidence and shown to be special.   (*Post, p. 175.*)

15. SAME.   *Example of special entry.*

Entry: "J. F. Scott enters 200 acres of land in said county [Morgan] on the waters of Rock Creek, beginning on the line of Russell Scott's land, on the south side of said land, and then running an oblong with the Carpenter road so as to include said road."   This entry may be made special by proof of the existence, location, and notoriety of the objects called for.   (*Post, p. 187.*)

16. SAME.   *Same.*

And it is sufficient for this purpose to show that "Russell Scott's land" was an old settlement well known in that community, and that the "Carpenter road" was an old and well-known road of that vicinity. This entry would then be located by bounding it on the north by Russell Scott's land and laying it off in an oblong including the Carpenter road.

17. SAME.   *Another example of a special entry.*

Entry: "H. M. Byrd enters 5,000 acres of land in said county, beginning on a stake at or near the east corner of J. F. Scott's 200-acre entry on the Carpenter road, thence running south 1,200 poles; thence east 1,500 poles; thence for complement to the beginning, so as to include the head-waters of Scutcheon."   This entry is special upon the proof of existence, location, and notoriety of the objects called for.   (*Post, pp. 186–189.*)

18. SAME.   *Same.   Locative calls.*

This Byrd entry contains three locative calls: (1) The 200-acre Scott entry, (2) the Carpenter road, (3) to include the head-waters of Scutcheon.   The proof shows that the 200-acre Scott entry is special, though unsurveyed, and that to begin the survey of the Byrd entry on its north-east corner would include the head-waters of Scutcheon,

Bleidorn *v.* Pilot Mountain C. & M. Company.

but that to begin on the south-east corner would include only part of the head-waters of Scutcheon. (*Post, pp. 186–189.*)

Cases cited and approved: Wallen *v.* Campbell, 2 Overton, 320; Talbot *v.* McGavock, 1 Yer., 271; Berry *v.* Wagner, 5 Lea, 564.

Cited and distinguished: Parrish *v.* Cummins, 11 Hum., 299; Fowler *v.* Nixon, 7 Heis., 719.

19. SAME.   *Example of an indifferent entry.*

Entry: "Thos. Scott enters 150 acres of land in said county (Morgan) on the waters of Emory river, adjoining the survey made in the name of Jacob Laymence, under the foot of the mountain, and running around under the foot of the mountain, joining the new ground." This entry was capable of being made special by proof of the existence, location, and notoriety of the natural and artificial objects called for. In the absence of such proof it is not a special entry. (*Post, pp. 201, 202.*)

Cases cited and approved: Wood *v.* Ellege, 11 Heis., 607; Barnes *v.* Sellers, 2 Sneed, 33; Brummett *v.* Scott, 4 Heis., 321.

20. SAME.   *Example of another indifferent entry.*

Entry: "Samuel Scott, Sr., enters 5,000 acres of land in said Morgan County, on both sides of Emory River, beginning on the east corner of Thomas Scott's 150-acre entry, on the east side of Emory, and then running up Emory on both sides for complement, to include the complement after plotting out all prior legal rights." This entry is not special on its face. There being no proof of the existence and notoriety of the natural and artificial objects called for, other than copy of the 150-acre entry, it is not special at all. (*Post, pp. 200–203.*)

Case cited and approved: Scott *v.* Lewallen (oral opinion at Knoxville in 1888).

21. SAME.   *Lines should be surveyed by horizontal measure.*

Calls for distance should be surveyed, in the absence of other controlling calls, by horizontal, not by surface, measurement. (*Post, p. 185.*)

22. SAME.   *Course and distance control, when.*

Calls for course and distance, without more, control in the running and establishment of lines and corners which have not been previously run and marked. (*Post, pp. 183, 198, 200.*)

Bleidorn v. Pilot Mountain C. & M. Company.

23. SAME. *Senior enterer or grantee cannot extend his lines to prejudice of junior claimant, when.*

Senior enterer or grantee, whose lines call for course and distance without more, cannot, by *ex parte* survey, made after the junior claimant's rights have attached, extend his boundaries beyond the legitimate calls of his entry or grant to the prejudice of such junior claimants. It might be different if the State alone were interested in the lands included by the extension. (*Post, pp. 197–200, 203.*)

Cases cited and approved: Chouning v. Simmons, 5 Hum., 299; Woodfolk v. Cornwell, 1 Head, 273; Nolen v. Wilson, 5 Sneed, 333; Fly v. E. T. College, 2 Sneed, 689.

Cited and distinguished: Whiteside v. Singleton, Meigs, 207; Overton's Heirs v. Cannon, 2 Hum., 264; Williamson v. Buchanan, 2 Overton, 278; Caruthers v. Crockett, 7 Lea, 91.

24. SAME. *Location of entry 1727.*

The eastern boundary of entry 1727 is located, upon the proof, as shown by dotted line upon the map. (*Post, p. 181. See map.*)

25. SAME. *Location of entry 1950.*

Entry 1950 is located upon the evidence as shown by the dotted lines upon the map, making the "two large poplars and two large white oaks" its south-eastern and controlling corner. (*Post, pp. 190–195. See map.*)

---

### FROM MORGAN.

---

Appeal from Chancery Court of Morgan County. H. R. GIBSON, Ch.

S. N. VANCE, W. R. TURNER, and G. W. PICKLE for Bleidorns.

L. A. GRATZ, HENDERSON & JOUROLMON, D. K. YOUNG, SAM EPPS YOUNG, J. H. LEWALLEN for Respondents.

LURTON, J.  This is a bill of ejectment.  The lands involved embrace some fifteen thousand acres, lying on the Cumberland Mountains, in Morgan County.

Complainants claim title under the will of Louis Bleidorn.  This will was executed in April, 1852. Under it this body of wild mountain land was devised to Mrs. Bleidorn for life, with remainder, at her death, to complainants.  Mrs. Bleidorn died November 7, 1882, and this bill was filed within three years thereafter.  Much of the land is adversely held, and as to this the plea of the statute of limitations is relied upon.  If this will was effective to create a life estate in Mrs. Bleidorn, then no possession which began during the existence of this life estate will operate to bar the suit of complainants, their suit having been filed within three years after the termination of the life estate.  The testator, Louis Bleidorn, resided, at the time of his death, in the city of New York.  Its execution and attestation occurred in the State of New York, and in all these respects it was executed in strict accordance with the statutes of this State concerning wills of realty. It was duly proven and admitted to probate in New York, and this probate was in accord with our statute.  The objection urged by defendants is that it was never admitted to probate in this State until 1887, some years after the institution of this action.  Defendants strenuously insist that a will conveying lands in this State is a nullity as a

conveyance of such land until recorded in this State, and that it operates as a conveyance only from the date of such registration. The question as to whether a will, duly probated in another State, and executed according to the law of this State, is operative as a conveyance of lands in this State without registration here, was most elaborately considered and answered in the affirmative by this Court in the case of *Smith* v. *Neilson,* reported in 13 Lea, 461.

This conclusion was reached as the proper construction of our statute of wills, and has been adhered to in more than one unreported case. The question is one which affects the titles to large bodies of land in this State; and a doubtful statute having been construed, after full argument and laborious consideration, the result then announced will be adhered to, however we might be disposed to regard it if an original question.

But upon another ground this defense would prove unavailing. Pending this litigation this will was duly proven and recorded in this State, and a copy of the record admitted as evidence without objection. The effect of this registration was to confirm and perfect the title of complainants, and this confirmation relates to the date of the execution of the will. It was not the acquirement of a new title after suit brought, but the confirmation of a defective title. The effect of the recording of the will was not to confer a title as of the date of the registration or probate; but to

vest and confirm title as of the date of the testator's death.

In *Crockett* v. *Campbell*, 2 Hum., 411, it was held that a deed executed after commencement of suit, confirming one defectively made before suit, was admissible, and operated to confirm the defective execution of a power of attorney.

So a tax-deed made after suit brought was held admissible in evidence in an ejectment suit, it being operative to confirm a deed theretofore made, but defective in its recitals. *Brien* v. *O'Shaughnessy*, 3 Lea, 725; see also *Ward* v. *Daniel*, 10 Hum., 607.

It follows that the will of Louis Bleidorn operated to create a life estate in his widow, and, as a result, no adverse possession which began after the death of the testator in April, 1852, will operate to bar complainants as remainder-men suing within the period allowed by the statute for such suit after the falling in of the life estate.

The title of complainants originated in three entries for about 5,000 acres each. These entries were made February 17, 1836. Grants issued upon all these entries to Thos. B. Eastland in June, 1838. These entries were numbered respectively, 1942, 1949, and 1950.

The contest over entry 1949 is chiefly with the Pilot Mountain Coal and Mining Company, who claim title under various grants to the larger part of the land covered by it. The entries and grants under which this corporation claims, or which are

relied upon as outstanding titles, superior to that of complainants are as follows:

*First.*—Entry No. 1727, grant No. 22339, to Julian F. Scott, for 5,000 acres.

*Second.*—Entry No. 1925, grant 22329, to H. M. Byrd, for 5,000 acres.

*Third.*—Entry 2683, grant 27076, to David McPeters, for 600 acres.

*Fourth.*—Entry 2244, grant 23171, to J. F. and R. Scott, for 500 acres.

*Fifth.*—Entry 1495, grant 22166, to Samuel Scott, for 5,000 acres.

None of these entries or grants cover the whole of complainants' entry 1949, and some of them lap upon each other.

*First.*—As to the conflict between entry 1727 and entry 1949. Entry 1727, as indicated by its number, is an older entry than 1949, but the grant upon the latter issued first, and unless 1727 was a special entry, then the older grant upon a younger entry is the better title. Entry No. 1727 is not in evidence. It is copied into the transcript, but counsel have signed an agreement that it was not read in evidence below. For this reason we cannot now look to it. It therefore not appearing that the senior entry was a special entry, the senior grant, though founded upon a junior entry, must be held the superior title.

To avoid this result, the defendant, the Pilot Mountain Coal and Mining Company, plead and rely upon a decree of the Chancery Court of Morgan

County, adjudging that entry 1727 was a title superior to that of complainants'. It is insisted that complainants were parties, and therefore concluded by this adjudication, and it is relied upon as *res adjudicata.*

To understand the effect of this plea, it is necessary that the facts concerning it be stated. The title of the Pilot Mountain Co. to much of the land claimed by it within the bounds of entry 1949, is by deed from one G. A. Fudickar. Fudickar, by a chain of conveyances, became the owner of entry 1727, which, as before stated, laps upon 1949, and covers perhaps one-half of the land within the younger entry.

While thus the owner of this title, Fudickar, on March 7, 1877, filed an original bill in the Chancery Court of Morgan County, charging that he was the owner in fee of a tract of 5,000 acres, same having been entered by entry 1727; that this entry conflicted with certain entries subsequently made, and that upon these junior entries grants had been issued to Thos. B. Eastland. He charged entry 1727 to have been a special entry, and that he had been in possession, under his title, for more than twenty years, and that the persons claiming title under the Eastland grants had never been in possession. He prayed that his title be decreed the superior title to the extent that it conflicted with the Eastland grants, and that the interfering titles be canceled as clouds upon his own superior title

This bill was filed against F. Clapp, S. S. Davis, and a number of others. Among those sought to be made defendants, and named in the caption as such, were a class of persons not designated by name, but described as "the heirs of L. Bleidorn." All of the defendants were stated to be non-residents of the State, and publication for them as non-residents prayed. Publication was made as prayed, and, none of the defendants appearing or defending, a decree *pro confesso* was entered; and this was followed by a final decree in accordance with the prayer of the bill.

By this decree entry 1727 and the grant thereon was adjudicated superior to any title claimed by defendants, and their titles canceled as clouds, and all of defendants were enjoined from setting up or asserting any which conflicted with that set out as owned by Fudickar. L. Bleidorn was dead at the date of this suit, and complainants were his heirs at law, though they take this land as devisees and not as heirs. If they were parties to this bill of Fudickar's, it may be assumed that in the Courts of this State they would be concluded by the decree therein rendered, although such a decree against non-residents—parties only by publication, and who entered no appearance—would be treated by the Courts of the United States and of other States as a nullity. *Hart* v. *Samson*, 110 U. S., 151, and cases cited.

When such a proceeding is expressly authorized by statute, a decree against a non-resident — a

12—5 P

party only by publication—is, from the necessity of the case, and by force of the statute, valid and conclusive within the jurisdiction authorizing such publication. Inasmuch, however, as the jurisdiction is dependent wholly upon statute, the compliance with the statute must clearly appear. If, therefore, the heirs of L. Bleidorn had been *named* in the caption as defendants, and publication been made for them by their proper names, such publication would have operated to make them parties as non-resident defendants. But they were not named either in the bill or in the publication. The only allusion to them in the bill is found in the caption, where they are sought to be made defendants by description as "heirs of L. Bleidorn."

By § 4352, subsection 5, personal service is dispensed with and publication authorized "when the name of the defendant is unknown, and cannot be ascertained upon diligent inquiry."

By § 4353 it is provided that "to dispense with process in either of the above cases the facts shall be stated under oath in the bill, or by separate affidavit, or appear by return." This bill was sworn to, and contained the statement that all of the defendants were non-residents. This was enough to authorize publication for *named* non-resident defendants. The bill, however, contained no statement that the heirs of L. Bleidorn were unknown, "and cannot be ascertained by diligent inquiry." Neither was this fact stated in any separate affidavit, nor did it appear in the

publication, nor by any recital in any decree or order of the Master authorizing publication. There was no authority to make publication by description for the "heirs of L. Bleidorn," unless the fact appeared in the bill, or by separate affidavit that their names were unknown and could not be ascertained upon diligent inquiry. The order of publication, where the name of the defendant is unknown, should not only describe the defendant by character, but should further do so by reference to his title or interest in the subject-matter of the litigation. Code, § 4358.

The plainest instincts of natural justice require that parties proceeded against in Courts of Equity or Law shall have an opportunity to be heard. Personal service of process can be dispensed with only in the few cases embraced by the statute, and when a decree is relied upon as concluding the rights of litigants who were not personally served, and who made no appearance, it must clearly appear that the statute has been complied with. *Ferriss* v. *Lewis*, 2 Tenn. Ch., 291–295.

The fact that the name of a defendant is unknown, and the further fact that the name could not be ascertained, are essential jurisdictional facts. These facts not appearing either in the bill or separate affidavit, nor being recited as facts in any decree authorizing publication, or otherwise in the record, the decree relied upon as *res adjudicata* was a nullity as to complainants. The second assignment of error is therefore sustained.

*Second.*—Has the statute of limitations barred a recovery of the land covered by entry 1727?

First, the possession of Levi Scarborough will be considered. In considering questions of boundary and possession, the map made by J. W. Scott, and filed as an exhibit to his deposition, will be the one referred to in this opinion. This map shows three separate possessions, designated as Scarborough possessions Nos. 1, 2, and 3.

The possession marked No. 1 is clearly south of entry 1727, though inside entry 1949. In considering defendants possession of 1727 this possession No. 1 will not be considered.

The possession designated No. 3, though inside 1727, is a late possession. Scott fixes it at not more than twelve or thirteen years old. This is not contradicted by any material or direct evidence in the record. This possession, having begun during the existence of the life estate, does not affect the suit of complainants as remainder-men.

Possession No. 2 was begun by the weight of proof in 1846 or 1847, and by the preponderance of the evidence was continued for something more than seven years. This possession was under Julian F. Scott, the grantee under entry 1727. Scott sold the land within his entry, January 8, 1853, to one J. S. Duncan. It has been much pressed in argument that Scarborough had abandoned his possession before this sale to Duncan. The evidence relied upon to show this is that of the witness E. R. Duncan. This witness states

that he surveyed this entry, 1727, in 1854, but does not state whether Scarborough was then in possession 'or not. „In another conn'ection he states that he "heard J. F. Scott, in a conversation with J. S. Duncan about this land, say that Scarborough had not treated him right; that he had kept him on that tract of land, and had fed him, and that he had 'went' off and left the land." Now, if this admission of Scott's was made before his sale to Duncan, or at the time of sale, then a possession begun in 1846 or 1847 (the witness fixing the origin of the possession as either in the one or the other) would not have continued seven years if terminated before January 8, 1853. But the witness does not fix the date of the conversation he heard. It was probably while making the survey in 1854, and, if so, it would not at all follow that the possession had been abandoned within seven years. The evidence of the witnesses Jessie Freels, Wiley England, E. J. Garrett, and Russell Scott seems to establish that the occupancy of Scarborough continued for about eight years, terminating in 1854 or 1855.

A more serious question arises upon the contention of complainants that this possession No. 2 was not inside the lines of 1727 when properly surveyed, and that therefore it was not held under color of title, and is now inoperative to defeat a recovery by complainants of the lands covered by 1727. Whether inside or outside depends upon the correct survey of defendants' title-papers. The

grant upon entry 1727 is numbered 22339, and issued December 25, 1838, being junior in date to complainants' grant upon their entry 1949. It was a grant for 5,000 acres, and is bounded as follows:

"Beginning at a white oak, the fork of the Carpenter road and R. Davis' path; thence east 894 poles to a stake; thence south 1,000 poles to a stake; thence 894 poles to a stake and pointers; thence a direct line to beginning."

The complainants' witness, J. W. Scott, who seems a most intelligent and candid witness, and a thoroughly competent surveyor, says that "in running according to grant I found no marked line at point where poles give out at end of first call of 894 poles east from beginning." "I found a marked line, apparently about twelve years old, running north and south at a distance of about 10 poles east of the line I run." Again he says: "The east line of 1727 runs west of the Scarborough possession No. 2 thirty-four poles, if the entry be run by the grant." If it be run by the deeds under which defendants hold, then he says the eastern line runs through possession No. 2, throwing about one acre inside the deeds under which the Pilot Mountain Company holds.

While the chain of deeds under J. F. Scott are not in the transcript, yet it does appear that the first line in some one of them is 940 poles long instead of 894, as fixed in the grant. The first deed after the land was granted to Scott was his conveyance, in 1853, to J. S. Duncan. Whether

this line was then lengthened, or by some subsequent deed, does not appear. The entry evidently was not run out before issuance of grant. This is evident from the fact that, with the exception of the beginning corner, all the other calls are for stakes.

Unless there was on the ground an old marked line, evidently old enough to raise the presumption of a line marked at the time of the survey for the grant, the line should stop where the poles give out. The only proof of a marked line is that of Scott, who says it was a very recent line, and only 10 poles east of where the poles gave out. This marked line, however, would not avail defendants, for if it is only 10 poles east of the line as run by Scott, it would throw the disputed possession 24 poles east of this recent line.

If this first line was extended after Scarborough abandoned possession, then his possession would not avail defendants, for, if his possession was without the grant to Scott, then it would be under no color of title, and would be limited to the actual adverse possession.

So, if before Scarborough abandoned possession, a deed was made by Scott, under whom he held, conveying his grant by metes and bounds so as to include land not within his grant, the former holding of his tenant without his title-papers would not be of any advantage to his vendee beyond the limits of the actual possession, unless thereafter continued under his deed long enough to

confer title to the limits of the deed. This would require a possession of seven years after deed embracing this possession. It therefore follows that this possession of Scarborough's must appear to have been within the grant to Scott, and that the fact that it was within the lines of the deeds which extended the first line of this grant will be unavailing, unless it also appear to have been within Scott's color of title when begun.

That Scott placed Scarborough where he did for the express purpose of perfecting his title to the lands within his grant, is clearly made out. Did he make a mistake, and locate him outside his title-papers?

This line of 1727 has been surveyed by three different surveyors. Scott, as we have already seen, found that if the first line be stopped at 894 poles, that this possession would be 34 poles east of the eastern line of the grant. He, however, found that if the first line be extended to 940 poles, that a small part of the possession would be included.

The country over which the first line runs was very rough and hilly. He says he ran a level line, and yet 894 poles did not include this inclosure.

S. H. Staples and E. R. Duncan both testify to having surveyed this line, and they each testify that this field of Scarborough's was, by their survey, west of the eastern line.

The survey by Staples was a surface survey. It does not appear whether that of Duncan was a

level or surface survey. Staples says that if he had made a level survey, the eastern line would have been from 60 to 100 poles farther east than he made it. It does not appear whether Staples and Duncan surveyed by the deeds calling for a first line of 940 poles or by the grant calling for only 894 poles. It is probable that their surveys were by the calls of the deeds. But if a surface line 940 poles long would include the disputed possession, it is most manifest that an horizontal survey of a line 894 poles would include this field.

The law construes a call for distance as a call for a point ascertained by horizontal survey. The method adopted by Scott was the right one. The method adopted by Staples was the wrong one, but disadvantageous to defendants. We have, then, Staples and Duncan, both competent surveyors, against Scott, equally as competent. The character of the gentlemen thus differing as to result of the survey, is unassailed. They seem to have no interest in the litigation. In view of the fact that this possession was taken by Scott, an old resident of the neighborhood, and an old surveyor, for the express purpose of perfecting his title against the Eastland grants, under which complainants hold, and of the further fact that two disinterested surveyors included this possession within the eastern line of defendants' grant, one of these surveys being as far back as 1854, and therefore long before this controversy arose, we

are persuaded to find with the Chancellor that
this possession, when the grant to Scott is prop-
erly surveyed, was within the grant, and that it
continued for seven years, thus operating to bar
complainants in so far as 1727 and 1949 interlap.
The first and fourth assignments of error are
therefore overruled.

*Third.*—The fifth assignment of error by com-
plainants is to so much of the decree by the
Chancellor as held that entry 1925, by Hannah
M. Byrd, was a special entry, and that the grant
thereon, which issued December 28, 1838, related
to the entry, and was therefore a superior title
to that of complainants, under an older grant but
younger entry. This grant conflicts alone with
complainants' entry 1949. The greater part of it
lies upon 1727, already adjudged the better title.
But as part of 1949 is covered by this entry and
grant, not protected by defendants' entry 1727, it
is plead as a superior outstanding title. This
entry was made February 7, 1836. Complainants'
entry was February 17, 1836. It is in the
following words and figures: "H. M. Byrd enters
5,000 acres of land in said county, beginning on
a stake at or near the east corner of J. F. Scott's
200-acre entry on the Carpenter road, thence run-
ning south 1,200 poles; thence east 1,500 poles;
thence for complement to the beginning, so as to
include the head-waters of Scutcheon."

This entry contains three locative calls: (1) The
200-acre entry of J. F. Scott, (2) the Carpenter

road, (3) so as to include the head-waters of Scutcheon.

The 200-acre entry of J. F. Scott which is called for, is shown to have been an entry made in 1834, and was as follows: "J. F. Scott enters 200 acres of land in said county on the waters of Rock Creek, beginning on the line of Russell Scott's land, on the south side of said land, and then running an oblong with the Carpenter road so as to include said road." Russell Scott's land was an old settlement, and well known in the community. The Carpenter road was an old and well-known road. The J. F. Scott entry, though unsurveyed when the Byrd entry was made, was capable of location by one acquainted in the neighborhood. The entry would be bounded on the north by Russell Scott, and by laying it off in an oblong, with the Carpenter road inside, its probable location could easily be ascertained. The call in the Byrd entry that it should be so run as to include the head-waters of Scutcheon, is, under the facts of this record, a very precise locative call. The call to begin at or near the east corner of J. F. Scott's entry, it is said de-stroys the special character of the call, inasmuch as the Scott entry must have two east corners, a north-east and a south-east corner, and it is said that it cannot be determined which corner is called for. This might be so but for the fact that the survey must be so made as to include the head-waters of Scutcheon. Scutcheon was a small stream

but well known. Scott, complainants' witness, says that if the beginning be at the north-east corner, as it was in fact afterwards surveyed, the entry will include the head-waters of Scutcheon, while if fixed at the south-east corner it would include part but not the entire head-waters of Scutcheon. The surveyor should, under such a state of facts, begin at the north-east corner of J. F. Scott's 200-acre entry, for he would thereby obey the direction that it should be so surveyed as to include the head-waters called for by the next locative call. This fact distinguishes the entry from those considered in 11 Hum., 299; 7 Heis., 719. The point of beginning is made particular and special by the subsequent requirements of the entry (2 Overton, 320; 1 Yer., 271) and brings it within the principle of the decision in 5 Lea.

That this Byrd grant has not been specially plead and relied upon as an outstanding title is immaterial. The complainants must not only have a title superior to that of defendants, but a title superior to any other. The weakness of the plaintiffs' title may be shown by proof without special plea. He must come prepared to show that he has the title to the land he sues for, and if it appear that the title is not in him, but in another, he must fail, although the defendant does not connect himself with such outstanding title. It is argued that this Byrd title is not a subsisting title, but one abandoned. This does not appear. It appears to be no more an abandoned

title than did that of complainants before suit brought. There is, in fact, so far as this record appears, no adverse possession on parts of this grant outside of the interlap with 1727, and no reason why Hannah Byrd or her heirs may not at any time assert it. It is insisted that the 200-acre entry of J. F. Scott is not properly proven; that the copy in the transcript is not properly certified. No exception was taken upon the trial below, and there is now no error assigned, because admitted as evidence. We therefore conclude that the fifth assignment of error is not well taken.

*Fourth.*—The sixth assignment relates to entry No. 2683, known as the Peaky Knob entry. The Chancellor held the entry special, and that there had been an adverse possession of seven years, beginning before death of Louis Bleidorn. A very small part of this entry lies within complainants' title. There have been two possessions on the entry, one without complainants' title and one within. Scott says that about one-half of the improvement at the south end of the Peaky Knob entry is inside entry 1949. This possession is known as the one in the gap, and as the possession of McPeters and Stringfield. It was taken as far back as 1849, and has been kept up for a time sufficient to bar complainants. The Stringfield possession referred to, by an agreement of parties entered as a decree as only nineteen years old, has no reference to this Peaky Knob entry. The Stringfield possession referred to by that

agreement, as shown by the deposition of String-field, was a modern one, and one inside entry 1727. The McPeters possession is not inside 1727, and the agreement manifestly refers to some other Stringfield possession. The assignment is not well taken.

*Fifth.*—The seventh assignment is to an entry known as No. 2244, or the old Hall place. But a small part of this entry is inside 1949, and all of the entry is covered by entry 1727, already held to be a title superior to that of complainants'. As the defendant, the Pilot Mountain Coal Company, owns both titles, it is unnecessary to say any thing further as to this assignment.

*Sixth.*—For convenience, the twelfth assignment of error will be disposed of before considering those that are intermediate. The Chancellor held that the south-east corner of complainants' entry No. 1950 was the two white oaks and two poplars, being the corner likewise of entries Nos. 1951, 1958, and 1959 in the Eastland and Lane system of en-tries and grants. The grant upon entry 1950 calls to "begin at a black gum and pointers, the north-east corner of entry No. 1949, in the name of H. Wilson; thence south 894 poles to a pine; thence east 1,000 poles to two large poplars and two large white oaks; thence north 894 poles to a stake and pointers; thence 1,000 poles to the be-ginning."

The grant upon entry No. 1951, which was subsequently surveyed, calls to begin " at a stake,

the north-east corner of entry 1950, * * * at a point 1,000 poles east of a black gum, the north-west corner of entry 1950; * * * running thence south 894 poles to *two large poplars and two large white oaks;* thence east, crossing a creek, 1,000 poles to a sugar-tree; thence north 894 poles to the beginning."

The grant upon entry 1958 calls to begin at a pine, "the north-east corner of entry 1957; * * * running thence south 894 poles to a poplar; thence east 1,000 poles to a stake; thence north 894 poles to *two large poplars and two large white oaks;* thence west 1,000 poles to the beginning."

The grant upon entry 1959 calls to begin at "*two large poplars and two large white oaks,* the north-east corner of entry No. 1958 * * * thence south 894 poles to a chestnut, etc.; thence east 1,000 poles to a chestnut, etc.; thence north 894 poles to a sugar-tree; thence west 1,000 poles to the beginning."

It will be observed that these four grants are of the same size. They were all issued to Thos. B. Eastland. Each calls for a corner described as "two large poplars and two large white oaks," and these four grants should corner on each other and on these two poplars and oaks. It is true that these grants do not call for each other, except in the case of grant on entry 1959, which calls for these poplars and oaks as the north-east corner of 1958.

The Eastland grants were all issued about the

same time and to T. B. Eastland, and upon entries made about the same time. The entries and grants correspond as to length of lines, and they cover almost the entire surface of Morgan County. They should connect, if properly run, the one with the other, and form a vast checker-board. The first in the series is entry No. 1927. Complainants' surveyor, Scott, has located 1950 upon his plot by beginning his survey at what he calls the beginning corner of the Eastland system of surveys, being a white oak, called for in entry 1927 as being 1,000 poles south of the junction of New River and Clear Fork. He also began at a living corner called for in entry No. 1933. Having run his first line south from the white oak corner, he then ran east from the living corner of 1933 until he intersected his south line. By the aid of these two living corners of these two remote entries, he was enabled, by pursuing course and distance and occasional marked lines, to locate 1949, 1950, and 1942 as he has plotted them. By this method the two poplars and white oaks are thrown more than a mile south-west of the south-east corner of 1950, as he has plotted it. These two poplars and two white oaks are shown to be well marked as a corner, with marks on the north, east, south, and west sides of the trees. Well-marked and very ancient marked lines are found on the ground running north, south, and east. Mr. Scott, who says these marked lines are very ancient, does not say whether he looked for a

marked line running from this corner west. He does say that this corner was pointed out to him as the corner of 1959. When asked if this is not the south-east corner of entry 1950, he says that "to take the calls of all the surveys of the Eastland grants and plot them according to the calls, the north-west corner of 1959 would be the south-east corner of entry No. 1950 when they are plotted."

That these poplars and white oaks are a living and well-marked corner of three of the Eastland entries is too clear for dispute. Entry No. 1949, which adjoins 1950 on the west, has no living corner. Entry 1950 has likewise no living corner, unless the call for two large poplars and two large white oaks be a call for these existing trees marked as a corner, and which would be the true south-east corner, as testified to by complainants' own surveyor, if the Eastland system be plotted according to the calls of the several grants. Somewhere the harmony of the system of these surveys has to be disturbed. Somewhere an error has been made. Starting from the very remote corners of 1927 and 1933, probably twenty miles away, and then running by course and distance, locates 1950 as placed upon the plot. But this ignores a very notorious living corner of four of the grants. We are of opinion that the true south-east corner of 1950 is the living corner fixed by the Chancellor. The effect of this is not to drop 1942, which lies north of 1950, down to 1950. It has no known

living corner, and does not call for either 1949 or 1950. It does call for the north-east corner of 1941, and must be located with reference to this call. The result is that between 1942 and 1950 there is a strip of land about one mile wide not embraced either · by 1950 or 1942. Whether this result is a consequence of an error in the original survey of these entries, or of one made by Mr. Scott in his location of 1942, we cannot say. On the proof in this record 1942 and 1950 do not connect.

The twelfth assignment is overruled.

*Seventh.*—The third and eighth assignments will be considered together. Complainants' title is traced back to one Henry Wells, who, in 1849, conveyed the lands embraced in 1949 and 1950 by deed to Louis Bleidorn. The learned Chancellor found that at the date of this conveyance Julian F. Scott, then the owner of the lands embraced in entries 1727 and 1495, was in the actual adverse possession of each of these entries, and the deed of Wells was therefore champertous as to the lands embraced within said two entries. As heretofore stated, entry 1727 laps only on entry 1949, while entry 1495 laps both on 1949 and 1950, the larger part of the conflict being with the latter entry.

We have· in the former part of this opinion decided that the Scarborough possession No. 2 on the plot was a possession under J. F. Scott, and within the interlap of 1727 and 1949. The Scarborough possession No. 1 is not within 1727, but

it is within the interlap of 1495 and 1949 as surveyed and plotted by defendants.    This possession existed at date of Wells' deed to Bleidorn in 1849. The possession known as the "long" field and the other  one  known  as  the  "Jo"  field,  under  the weight of proof, were adverse, and by tenants of Scott  at  date  of  Wells'  deed.

The  first  of  these  possessions  was  within  the interlap  of  1950  and  1495,  as  we  have  located 1950.    The  "Jo"  field  is  likewise  inside  1950,  and within  the  lap  of  that  grant  upon  1495,  as  same is  surveyed  by  defendants.    Without  now  considering  the  question  as  to  the  proper  survey  of 1495,  it  is  enough  to  say  that  the  effect  of  the adverse  holding  of  Scott  by  Scarborough  at  possession  No. 2,  at  time  of  the  conveyance  of  the lands  embraced  in  entry  1949,  was  to  make  that deed  champertous  and  void  in  so  far  as  entry 1727  conflicts  with  the  conveyance.    The  effect  of the  adverse  holding  of  the  "long"  field  at  date of  the  conveyance  of  entry  1950  to  Bleidorn  was to  make  that  deed  champertous  and  void  so  far as  it·  conflicts  with  entry  1495.    It  has  been  urged that,  inasmuch  as  Wells  was  a  non-resident  of  the State  at  the  date  of  his  deed  to  Bleidorn,  his deed  was  not  champertous,  because  the  lands  conveyed  were  not  at  the  time  held  by  one  adversely under  "deed,  devise,  or  inheritance."    Code, § 1779, provides  that  a  conveyance  by  a  non-resident  shall not  be  void  where,  at  the  time  of  such  sale,  the lands  were  not  held  adversely  by  one  holding  un-

der "deed, devise, or inheritance." Scott held the
lands embraced in entry 1727 by a grant to himself,
and he held the lands embraced in entry 1495 under
a decree of the Chancery Court vesting title in him
as a purchaser, at chancery sale, of the lands of
Samuel Scott, sold to pay debts and for partition
among his heirs. We think a possession by one
holding under a grant or decree vesting title is
one holding under deed within the meaning of
the statute. The clear purpose of the saving in
favor of non-residents was to make the sale good
only where the holding was under no color of
title. In such a case a naked adverse possession
was not to affect the deed of a non-resident with
champerty. This seems to be the construction put
on the Act in *Whiteside* v. *Martin*, 7 Yer., 384–
396. If the possession was under any conveyance
purporting to convey title, the holding is under
a deed in the meaning of the statute. By § 1780
of the Code it is provided that "champerty shall
be presumed until the purchaser shows such sale
was *bona fide* made."

It is now contended that the sale by Wells to
Bleidorn was in good faith, and is therefore good.
This provision just quoted was made in view of
the exceptions in the previous sections of the Act.
The provision is part of the original Champerty
Act of 1821, and was construed in *Gass* v. *Ma-
loney*, 1 Hum., 452, as applying not to the *bona
fides* of the parties to the sale, but with reference
to the provisions and policy of the Act.

*Eighth.*—The seventh assignment raises the question as to whether entry 2244, which conflicts with entry 1949, is special. It is unnecessary to rule upon this, inasmuch as this entry lies inside 1727, and we have already decided that the latter entry was the superior title by reason of adverse possession.

*Ninth.*—The defendant, Wm. Lewallen, is the owner of entry No. 1800, upon which he obtained grant No. 22704. This was an entry for 2,500 acres. It laps upon complainants' two entries, 1950 and 1942. Plotting 1950 as having its south-eastern corner upon the two poplars and oaks, a very large part of this entry lies between 1942 and 1950, reducing the lap inside of 1950 to a very few acres. Lewallen has had a very ancient possession within the lap of his entry upon 1942, This possession antedates the death of Louis Bleidorn, and was continued more than seven years. Complainants concede that this possession has barred any recovery of so much of entry No. 1800 as lies within their entry No. 1942.

The ninth assignment assigns as error in the Chancellor the decree adjudging that the true boundary of 1800 is to be determined by the marked lines found upon the ground which extend the entry beyond the calls of the grant. If the grant to Lewallen be surveyed according to its courses and distances, it will contain 500 acres less than are found within the marked lines contended for by defendant. This grant is laid down on the

plot made by Surveyor Scott in such way as to show by dotted lines the grant as surveyed by its calls and distances, and by solid lines the grant as it is marked off on the ground.

The defendant, Lewallen, says the entry was not surveyed all around before issuance of grant; that the original survey was made by one Staples, who surveyed only the eastern boundary of the entry and a part of the north line, marking a Spanish oak as the beginning corner. Afterward, the lines were all surveyed and marked by one Vaughn, a deputy county surveyor. He says he always claimed to these marked lines, and that his neighbors recognized them as his lines.

The grant calls for marked trees at the two eastern corners; the other calls are for distance and stakes. The proof is, that the lines running east and west, as marked by Vaughn after issuance of grant, are 130 poles longer than the distance called for in the grant, and that the eastern line, which is the only one claimed to have been marked at date of grant, shows much more ancient marks than the other lines. From Lewallen's own proof, it is clear that when he had his lines marked, he extended the length of his grant 130 poles beyond its true calls. His possession is not within this extension.

Entry 1800 is older than complainants' entry by a few months, but the grant is something over a year younger than complainants' grant. Lewallen does not state the date of his extension.

But as his grant is younger than complainants' grant, and his extension was made after his grant, it follows that before he had extended and marked his lines complainants' entry was made and grant obtained.    It is not a case where the State alone was concerned in the marking of his lines. Younger enterers had acquired rights, and their rights could only be affected by a processioning in strict accord with the Act of 1806, carried into the Code at § 2020 *et seq.* This Act requires notice.    There is no pretense that notice was given adjoining land-owners, or that complainants or their privies in estate were present or countenanced this marking and extension.    In discussing the early cases of *Whiteside* v. *Singleton*, Meigs, 207, and *Overton's Heirs* v. *Cannon*, 2 Hum., 264, this Court said, in *Chouning* v. *Simmons*, that in those cases "there were no adjacent owners, the land being vacant and unappropriated, and of course the question of notice could not arise, and did not, the controversy being between an enterer subsequent to the survey and the original grantee." 5 Hum., 303.

It would hardly seem necessary to argue the proposition that a subsequent enterer's rights cannot be affected by a resurvey and remarking of an older entry, unless the formalities of the processioning Act are shown to have been complied with, or unless, after knowledge, he acquiesces under such circumstances as amount to an estoppel. There is no element of estoppel here.    The ac-

quiescence of adjacent neighbors cannot affect complainants, who are not shown to have had any knowledge whatever of the extension of the lines of this conflicting entry, or of the survey and marking of these lines.

The question we regard as settled by the cases of *Chouning* v. *Simmons*, 5 Hum., 299; *Woodfolk* v. *Cornwall*, 1 Head, 273; *Nolen* v. *Wilson*, 5 Sneed, 333; and *Fly* v. *E. T. College*, 2 Sneed, 689. The case of *Williamson* v. *Buchanan*, 2 Overton, 278, is not in point. The remarking and extension was done before the rights of younger enterers accrued. So in the case of *Caruthers* v. *Crockett*, 7 Lea, 91.

Entry 1800 is the superior title only to the calls and courses contained in the grant, and the second line must stop at the point where the poles give out. It is not a case where course and distance yield to natural objects or to an old marked line presumably run before the grant issued. This grant calls for courses and distances only; and it not being shown that the lines as marked on the ground were so run and marked at the time the grant issued, the lines must terminate, as against the conflicting rights of a younger enterer, where the distance gives out.

The ninth assignment is therefore sustained.

*Tenth.*—The tenth assignment relates to the character of entry 1495, as to whether it is general or special. The entry is in these words:

"Samuel Scott, Sr., enters 5,000 acres of land

in said Morgan County, on both sides of Emory River, beginning on the east corner of Thomas Scott's 150-acre entry, on the east side of Emory, and then running up, Emory on both sides for complement, to include the complement after plotting out all prior legal rights." Entered September 15, 1832.

We held, in the case of *Scott* v. *Lewallen*, at the September Term, 1888, that this entry was not special on its face. It is now insisted that under the proof in the record the entry is special. The only evidence relied upon to show it a special entry is an entry for 150 acres in favor of Thos. Scott, and presumably the one called for in entry 1495. This Thos. Scott entry is in these words:

"Thos. Scott enters 150 acres of land in said county on the waters of Emory, adjoining the survey made in the name of Jacob Laymence, under the foot of the mountain, and running around under the foot of the mountain, joining the new ground."

There is no proof as to the location of this entry, none as to a survey in the name of Jacob Laymence, and none as to what is meant by the call for the foot of the mountain. In other words, there is no proof that the natural objects called for ever existed or were notorious. Neither is there proof as to the notoriety of the place on which Samuel Scott then lived. The Thomas Scott entry was one capable of being shown a special entry by proof of the existence of either the

natural or artificial objects called for and their notoriety. No such proof being made, a call for it in the entry subsequently made by Samuel Scott does not make it a special entry. Of course, if it had been shown that the Thomas Scott entry was a notorious entry, or if this entry had been supported by proof of the notoriety of the objects called for in it, such proof would operate to make entry 1495 a special entry. In the absence of such proof, we are constrained to hold that it is not special, and that the grant thereon does not relate to it. *Wood* v. *Elledge*, 11 Heis., 607; *Barnes* v. *Sellers*, 2 Sneed, 33; *Brummett* v. *Scott*, 4 Heis., 321.

The entry belongs to that class of entries which may be aided by proof and thus shown to· be a special entry.

The tenth assignment is sustained.

The thirteenth and fourteenth assignments relate to the finding by the Chancellor that ˙there was an adverse possession within entries 1495 and 2661, both of which conflict with 1950, and that this possession began before death of Bleidorn, and was continued for seven˙ years. It is sufficient to say that neither of these assignments is well taken. The weight of proof is with the finding of the Chancellor.

The fifteenth assignment, relating to a 100-acre claim in favor of Defendant Sexton, is likewise overruled.

A question has been made as to the. supposed

extension of the lines of 1495 after issuance of grant, and complainants insist that this entry and the grant thereon contains 1,800 acres less than as it is marked on the ground, and that the lines have been extended by a remarking.

There is no proof of this. Complainants' witness, Scott, when asked as to the age of the marked lines, says: "It is a very old line, but I think I noticed marks on the first line of the grant which appeared to be older." The presumption is that this very old marked line was the line of the original survey, and this. proof is altogether insufficient to overcome this presumption.

This entry had been surveyed before complainants' entries were made, and it would require very clear proof—such as was made in the case of entry No. 1800—of a remarking and extension subsequent to the vesting of complainants' rights to overcome the presumption in favor of an old marked line.

The conclusion we reach upon the whole case is that the defendants have maintained their defenses to the lands embraced in their special pleas, and are entitled to an affirmance of the decree of the Chancellor, save as to the Defendant Lewallen, against whom complainants are entitled to a modification of the decree in so far as to allow them to recover so much of the lands embraced in entry 1942 as is not within the lines of entry 1800 when surveyed by the grant, the second line being terminated at the point where the distance gives

out, ignoring the recently-marked line. A small part of entry 1800 laps upon entry 1950. This lap is not within Lewallen's entry when properly surveyed, and complainants will also recover this. The recovery by complainants embrace but a small part of the lands sued for, and but a small part of that for which they sued Lewallen. Complainants will therefore pay ninety per cent. of all costs, and the remainder will be paid by Lewallen.

Chief Justice Turney concurs in the result, but he does not believe that the case of *Smith* v. *Neilson*, 13 Lea, .461, should be followed, and dissents on this point of the opinion.

OPINION ON PETITION TO REHEAR.

(*Knoxville.*    October 28, 1890.)

1. WILL, FOREIGN.  *Passes lands in Tennessee without probate or registration here.*

Doctrine re-affirmed that a foreign will, executed and attested in conformity to our statutes, passes lands situated in Tennessee without probate or registration in this State where it has been duly proved and recorded at the testator's domicile in another State under statutes of that State identical with our own.

Code construed: §3022 *et seq.* (M. & V.); §2182 *et seq.* (T. & S.).
Case cited and approved: Smith *v.* Neilson, 13 Lea, 461.

2. SAME.    *Case in judgment.*

B's will devised lands situated in Tennessee to his widow for life, and remainder to his children. This will was executed and attested as required by our statutes. It was duly proved and recorded in New

Bleidorn *v.* Pilot Mountain C. & M. Company.

York, the testator's domicile, under statutes of that State identical with our own. It was not recorded or registered in Tennessee. After B's death a stranger to his title took possession of the devised lands, and held them adversely for a period of more than seven years under an independent, but inferior, claim and color of title. This adverse possessor had no notice, actual or constructive, of B's will. He conveyed his supposed title to a purchaser who had none. The remainder-men sued this purchaser for the land within three years after the life tenant's death. Seven years' adverse possession was interposed as a defense to this suit.

*Held:* The suit was not barred. B's will passed a life estate to his widow and the remainder interest to his children as of its date, and therefore seven years' adverse possession taken and held pending the life estate could not bar remainder-men's suit brought in time after the life tenant's death.

3. SAME. *Effectual against strangers.*

The fact that the adverse holder was a stranger to B's title, and claimed under an independent color of title, does not affect the result declared.

4. SAME. *Effectual as to purchaser of adverse holder's claim.*

B's will affects the *purchaser* of the adverse holder's claim to the same extent as the adverse holder himself. Such purchaser is not protected against the unregistered will as a *bona fide* purchaser without notice.

5. LAND LAW. *Construction of grant including and excluding older claims.*

A grant including within its calls, but excluding from its operation by general description, lands that are held under "prior and legal claims," confers title upon the grantee to all the lands embraced within its calls which are not shown to have been held by older titles. The older titles and their location must be affirmatively proved by those who rely upon them, if they do not otherwise appear.

Cases cited and approved: Bowman *v.* Bowman, 3 Head, 47; Fowler *v.* Nixon, 7 Heis., 719.

6. SAME. *Same. Effect of proof of older titles.*

But when such "prior and legal claims" thus included and excluded by the grant are established and located by proof, that portion of the lands embraced by these older titles ceases to be part of the land covered by the grant. In surveying the grant its lines should be so run as to exclude them. The grant is not even color of title for that portion of the lands thus covered by the older titles.

Bleidorn *v.* Pilot Mountain C. & M. Company.

7. SAME. *Same. Same.*

And therefore adverse possession of part of the lands covered by the "prior and legal claims," and thus included and excluded by the grant, is not within the legal boundaries of the grant, nor hostile to the title claimed under it.

Cases cited and approved: Hare *v.* Kelly, 1 Hum., 163; Smith *v.* Lee, 1 Cold., 549.

(See also Peck *v.* Houston, 5 Lea, 227.)

8. SAME. *Case in judgment.*

Three grants, designated on map as 1925, 1949, and 1727, and having priority in the order named, had a common interlap, and 1949 and 1727 also interlapped outside 1925. There was possession (designated on map as "Scarborough possession No. 2") held for seven years by those claiming under 1727 upon the common interlap, but none upon the interlap of 1949 and 1727 outside 1925. 1949 included in its calls 5,590 acres, but purported to convey only 2,500 acres. It included "of prior and legal claims 3,088 acres of land." Claimants under 1949 sued those in possession upon the common interlap claiming under 1727. In defense 1925 was established as an outstanding title superior to 1949. The possession upon the common interlap was interposed to defeat this suit as to the land embraced in the interlap of 1949 and 1727 outside 1925.

*Held:* The common interlap is excluded from 1949, and possession thereon was not effectual to defeat title under 1949 where it interlapped alone with 1727.

9. SAME. *Pleadings. Estoppel.*

Complainants are not estopped, by suing for the whole of 1949, to insist that possession upon the common interlap is not within the legal boundaries of 1949, when defendants have affirmatively shown that 1925 was a "prior and legal" claim, and therefore excepted out of 1949.

10. SAME. *Assignment of Error.*

And the question as to the legal effect of this possession upon the title of 1949 is sufficiently raised by an assignment of error by claimants under 1949, averring that the Chancellor erred in holding that "the Pilot Mountain C. & M. Company has the superior title to complainants' entry 1949, and that it and those under whom it holds and claims title have had adverse possession more than seven years before the death of L. Bleidorn."

Bleidorn *v.* Pilot Mountain C. & M. Company.

11. SAME. *Same.*

And it is not material that among the reasons stated in support of this assignment of error the one now relied upon for rehearing was not embraced. A good assignment of error is not vitiated by the statement of insufficient reasons in its support.

---

FROM MORGAN.

---

Appeal from Chancery Court of Morgan County. H. R. GIBSON, Ch.

S. N. VANCE, W. R. TURNER, and G. W. PICKLE for Bleidorns.

HENDERSON & JOUROLMON, L. A. GRATZ, D. K. YOUNG for Pilot Mountain C. & M. Company.

LURTON, J. Two petitions to rehear have been filed; one by the defendant, the Pilot Mountain Coal and Mining Company, and one by the complainants. By the first we are asked to reconsider our determination to adhere to the ruling made in the case of *Smith* v. *Neilson*, 13 Lea, 461, that a foreign will proved and recorded in the State of the testator's domicile according to the requirements of the laws of this State will pass lands in this State without record or registration here. The only reason now advanced for a reconsideration is the suggestion that the holding upon the effect of such an unregistered will was unnecessary

to the decision of that case, and therefore *obiter*. This is not supported by a careful consideration of the facts of that case. The Court deliberately decided that the will was one of realty, and the principal question considered in the opinion of Judge Cooper was as to the validity of such a will as a muniment of title without registration in this State as required by Code, §§ 2183, 2184. The question was stated as being one vital to the rights of complainants, and as such it was fully discussed and expressly decided. The reasoning of Judge Cooper cannot be strengthened by any thing we can add. We have followed the case in more than one unreported cause, and are not at all disposed to question it as an authority. That the Pilot Mountain Coal Company claims title from a source entirely independent of the Bleidorn title is now advanced as a reason why it should not be affected by an unregistered will. This argument is based upon the syllabus in the Smith and Neilson case, wherein such an unregistered foreign will of realty is held to be valid as a muniment of title " *as between the parties.*" This syllabus is no part of the decision, although we may have reason to believe it to have been prepared by the Judge who wrote the opinion of the Court. This, however, is unimportant, for the limitation put upon the effect of such a will is only one way of stating the effect of an unregistered conveyance, and does not mean that such an instrument would not be valid as between any others than persons

claiming under the will, or under the title of the testator. All persons, except creditors existing or subsequent and *bona fide* purchasers, are, whether parties or not, bound by an unregistered conveyance. Code, § 2890.

The point decided in *Smith* v. *Neilson* was that at common law a will of realty duly executed was a muniment of title without regard to probate, and that our statute concerning foreign wills of realty, duly executed according to our law, did not operate to destroy the effect of such a will as a muniment of title by the requirement of registration in this State. The Pilot Mountain Coal Company are purchasers of a title inferior to that acquired by Louis Bleidorn. They do not claim under him, or under his heirs, but claim under an independent title utterly worthless unless perfected by adverse possession. Whether their vendor had had such adverse possession as operated to extinguish the paramount title vested by recorded grants and deeds in Louis Bleidorn, depended upon when it was begun, its duration and continuity. The outstanding life estate in Mrs. Bleidorn had been extinguished by adverse possession, but the remainder estate in complainants was asserted by suit before the statute had operated to destroy it. To say that a purchaser of a title wholly dependent upon adverse possession is a *bona fide purchaser* in such a sense that he cannot be affected by an unregistered will or deed which had operated to put the title in such a situation as to prevent the opera-

14—5 P

tion of the statute against a remainder estate of an estate, would be putting a mere trespasser upon an equal footing with *bona fide* purchasers without notice of an unregistered conveyance by their vendor. This would be to add a most iniquitous provision to our registration law. The petition of the Pilot Mountain Coal Company must be dismissed with costs.

The complainants in their petition ask a rehearing as to the legal effect of the possession within entry 1727, and known as the Scarborough possession No. 2. This possession we held to be within the interlap of complainants' entry 1949 and defendants' entry 1727, and that it had continued for more than seven years, and, having been begun before the death of Louis Bleidorn, had operated to defeat complainants' title, so far as the entries or grants thereon conflicted.

Complainants now call attention to the fact that this possession is within entry 1925, known as the Hannah Byrd entry, and that this being a special entry, is excluded from the grant under which they claim, and that it therefore follows that this possession, not being within the grant and deeds under which they claim, is inoperative as an adverse possession within the interlap of 1727 and 1949. This question was not decided, and attention was not called to it either in the oral or printed arguments. It is therefore a question properly raised by petition for rehearing.

The grant to Eastland upon entry 1949 describes

the granted land as a certain tract containing 2,500 acres, "beginning at a stake and pointers, the north-east corner of entry 1948; * * * thence south 894 poles to a stake and pointers; thence east 1,000 poles to a pine; thence north 895 poles to a gum and pointers; thence west 1,000 poles to the beginning, *including in the above calls of prior and legal claims* 3,088 *acres of land.*"

A calculation will show that the calls include about 5,590 acres, of which only 2,500 were granted; for the calls include, as stated in the grant, 3,088 acres of prior legal claims.

The effect of such a grant is to confer upon the grantee a legal title to all the lands within the calls of the grant not shown to have been held at the time by a superior title. When, however, it is shown that within the calls there was a superior legal claim by older special entry or by an older grant, then the effect of such proof is to exclude such older superior claim from the operation of the grant, and the grant, as to such excluded older claim, is not operative as color of title to the land so included and excluded. *Bowman* v. *Bowman*, 3 Head, 47; *Fowler* v. *Nixon*, 7 Heis., 719.

The defendant, the Pilot Mountain Coal and Mining Company, introduced the entry and grant to Hannah Byrd, and relied upon it as an outstanding, paramount title, operating to defeat complainants in so far as it conflicted with complainants' grant. We decided that it was a subsisting, par-

amount title, and, as such, effective to defeat complainants to the extent of its interlap with 1949. Another necessary effect of this proof is to exclude the lands so held from the operation of complainants' grant—that is, complainants' grant must be so run as to *exclude* this older title. The Scarborough possession No. 2 was apparently within the interlap of the three grants; but while it was within the entry 1727, and within the interlap of 1925 with that entry, yet, being upon an older claim excluded from the grant on 1949, it was not in fact within the interlap of 1727 and 1949, and was not therefore a possession adverse to complainants. *Hare* v. *Kelly,* 1 Hum., 163; *Smith* v. *Lee,* 1 Cold., 549.

This result would not follow if the deeds under which complainants hold had embraced all the lands within the grant lines; but these deeds all described the lands as the lands covered by the grant, and none other. It follows that complainants had no paper-title which covered the possession of Scarborough, and his possession was not adverse to their title, being without their grant and deeds.

The defendants, the Pilot Mountain Company, make two answers to this petition to rehear upon this point. The first is that complainants, having in their bill claimed and sued for all the lands embraced within the calls of the grant under which they claim, are therefore estopped to now say that any lands thus included were in fact excluded from their title-papers.

Under the cases of *Bowman* v. *Bowman*, 3 Head, 47, and *Fowler* v. *Nixon*, 7 Heis., 719, it devolves upon a defendant who disputes the title of a plaintiff who claims under a grant excluding older titles without definitely describing such excluded tracts, to show the existence of such older titles affirmatively; otherwise such a plaintiff may, under such a grant, recover all lands within the calls of his grant. This proceeds upon the ground that the grant operates to convey all lands to which the State had title, *all vacant land* within the calls, and that *prima facie* all was vacant, the fact of older claims not specifically appearing in the absence of definite description. Here the defendant made such proof, and its legal effect was to defeat complainants by showing a superior outstanding title. But another of the legal effects of such evidence was to entirely exclude this paramount title from the operation of complainants' grant—by force of the excluding words of the grant. We do not think that complainant is estopped from insisting upon the full legal effect of the proof made by defendant of an outstanding paramount title.

The defendants' next answer is, that under the assignment of errors no such question is raised. The first assignment of error insists that it was error in the Chancellor to hold and decree that "the Pilot Mountain Coal and Mining Company has the superior title to complainants' entry 1949, and that it and those under whom it holds and

claims title have had adverse possession more than seven years before the death of L. Bleidorn." Now, it is manifest that if the possession of defendant was of a part of 1727 not within the interlap of 1949, that such possession could not be adverse. That this assignment is broad enough to cover the question of the legal effect of a possession without the interlap must be obvious. That complainant, in his statement of reasons in support of this assignment has failed to state the particular one now relied upon, is not fatal. We have construed the rule requiring assignments of error with liberality, and to hold that a good assignment is rendered bad by the insufficiency of the reasons advanced in its support would be highly technical and a sticking in the bark.

In view of the fact that there has been no adverse possession within the interlap of 1727 and 1949, it becomes now necessary to rule upon complainants' seventh assignment, no opinion having been expressed in the original opinion. This assignment relates to the character of entry 2244, known as the old Hall place. This entry conflicts with entry 1727 and entry 1949. It is a younger entry than complainants' entry 1949, and the grant thereon is an older grant than complainants' grant. But we are of opinion that, under the proof, this entry is a special entry, and that defendants' grant thereon therefore relates to the entry. The legal effect of this is to make defendants' grant the older and better title, it not being shown that

complainants' entry 1949 was a special entry. . The decree heretofore entered will be so modified as to permit a recovery by complainants of so much of entry 1727 as is within the interlap of 1949 and not embraced within special entries 2683 and 2244, complainants' grant on entry 1949 being so plotted as to exclude all lands embraced within the older claim known as the Hannah Byrd entry.

In plotting out the lands recovered, the map of Surveyor Scott will be adopted, except in so far as we have in this opinion decided it to be erroneous.

The decree as to costs will be so modified as to tax one-fifth of the entire costs to the Pilot Mountain Coal and Mining Company.