### E. E. RICHARDSON et al., v. FREDERICK SCHWOON, et al.

Middle Section. December 19, 1925.

Certiorari denied by Supreme Court December 11, 1926.

1. Public Lands. Special entry defined.

An entry to be special, must in some part of it contain a reference to some thing or natural mark from which, either singly or together, the land can be ascertained with reasonable industry by those acquainted in the neighborhood.

2. Public Lands. Example of indefinite entry.

"Stephen M. Griswold enters five thousand acres of land in Grundy county, Tennessee, on the headwaters of Collins River, beginning on a black oak standing on the bluff of Piney Creek, and on the old Indian Trace; running southward by crossing the Jasper Road; thence, eastwardly, then northwardly; thence westwardly to the beginning, including the piney thicket and mill seat, platting out all valid entries within said bounds."

3. Public Lands. Entry containing description that might fit many tracts of land is not special.

An entry calling for black oak on bluff of Piney Creek, on the old Indian Trace, running southward crossing the Jasper Road, and including the piney thicket and mill seat, is not special, because there might have been many black oaks on the bluff and on the old Indian Trace, and many piney thickets and mill sites within the region. Such description does not contain locative calls capable of being shown by proof to be so distinctive that a subsequent enterer would be bound to take notice of the land described.

4. Public Lands. When plat of surveyor does not aid entry to render it special.

An entry cannot be made to possess the qualities of specialty by the survey; and where the surveyor in his plat does not show any of the objects mentioned in the survey, no presumption of sufficiency of evidence as to specialty can arise, and the entry is not helped with reference to any specialty features by the survey:

5. Tax Title. Recitals in deed of public officer presumed correct.

Under chapter 334, Acts of 1907, Shannon's Code, sec. 5572a2, recitals in deed of revenue collector, executed in 1861, to lands sold for taxes, as to execution of power of the officer, are presumed to be true, and the deed need not be supported by certified copy of the record authorizing the sale of the land and execution of the deed. Want of jurisdiction in circuit court rendering judgment of sale for taxes not appearing on the face of such deed, it is not subject to be impeached collaterally.

6. Deeds. Acknowledgment. No distinction under section 3761 of Shannon's Code.

In applying the conclusive presumption, under Shannon's Code, sec. 3761, that a deed registered for more than twenty years was registered upon

lawful authority, no distinction is made between a void acknowledgment and a defective acknowledgment. All inquiry upon the subject of probate is cut off.

7. **Adverse Possession.** Possession of smaller tract for less than seven years under color of title will extend to larger tract acquired which includes it.

Where party held possession of smaller tract for two years under color of title, his possession, being adverse, will extend to larger tract including it and acquired by him, upon such acquisition; and invasion of larger tract is not necessary. Invasion of the larger tract outside of the smaller tract is only necessary when title by possession to the smaller tract has been fully acquired.

8. **Boundaries. Interlap. Evidence considered.**

Where the common corner of grants is designated as "a pine on Turpentine Branch," the point is on or at the stream, and it is not to be supposed that it is a pine on a ridge nearly four thousand feet away. The designation is not the equivalent of "on the waters of Turpentine Branch." In view of the evidence showing marked lines and corners, the calls conforming reasonably to natural objects, the recitals in contemporary grants to adjoining lands, the consistency of calls in grants with the natural objects on the ground, and applying the rule that natural or artificial objects called for as special and locative control course and distance, it is concluded that there is no interlap between grants Nos. 4937 and 4935 under which the parties respectively claim; and therefore no title by adverse possession has been acquired by either against the other.

9. **Boundaries. Rules applied to determine.**

Rules applied, that the safest way to ascertain boundaries is to compare the grants with the marks and natural objects on the ground; that the proper method for ascertaining the boundaries of a grant is to find, if possible, the lines which the surveyor surveyed on the ground; that the boundaries of a grant as actually surveyed are the limits of the grantee's right; and that the calls which are most certain, about which there is less probability of mistake or inaccuracy, are to prevail.

10. **Courts. Stare Decisis.** When rule does not apply to title depending on location of boundary line.

Where the court has not before it the records in former cases involving location of boundary line, and therefore has no judicial method of ascertaining whether or not the case before it proceeds upon the same state of facts presented in former cases, it cannot apply the rule that a title previously passed upon, although in a suit between other parties, will not be again examined and adjudicated in a case presenting the same question and proceeding upon the same state of facts in the absence of a showing that the former decision was manifestly erroneous.

Appeal from Chancery Court, Grundy County; Hon. T. L. Stewart, Chancellor.

Reversed.

W. D. Spears, of Chattanooga, for appellants.

J. D. Fults, of Tracy City, for appellees.

DeWITT, J. In this cause the complainants have appealed from the decree of the Chancellor dismissing their bill. It was a bill of ejectment to recover a tract of land in Grundy county included within the boundaries of a larger tract granted by the State of Ten-

Vol. III T. A.—33.

nessee on January 6, 1837, to Samuel Edmundson by grant number 4937, based on entry number 4355, dated December 30, 1836, in the name of Stephen M. Griswold. The land involved in this cause is described as follows:

"Situated in the 2nd Civil District of Grundy county, Tennessee, on the waters of Big Creek, being all that portion of the Samuel Edmundson grant No. 4937, which is more fully described as follows: 'Beginning on a spotted oak at the forks of the Tracy City-Altamont road where the old road left said road leading in the direction of where W. A. Griswold's saw mill on Big Creek is located, running thence south with W. A. Griswold's line to where it strikes the north boundary line of the Jesse Wooten tract; thence east with the north boundary of said Wooten's tract to a hickory and chestnut on the Tracy City and Chattanooga road on the hill near the bridge, the northeast corner of said Wooten tract; then south with the east boundary line of said Wooten tract until it strikes the center of Big Creek; thence with the center of Big Creek southwardly up said creek until it reaches the south boundary of the Samuel Edmundson grant No. 4937; thence east with the south boundary line of said Edmundson grant No. 4937, to the southeast corner of said grant; thence north with the east boundary line of said grant No. 4937 to the northeast corner of said grant; thence west on the north boundary line of grant No. 4937 crossing the gulf of Big Creek to John Northcut's line at his corner, a double chestnut stump; then with said Northcut's line southwestwardly to the road leading from the Chattanooga and Altamont road to the old Griswold saw mill; thence with the center of said road to the beginning, being the same land that was conveyed by Stephen M. Griswold to W. A. Griswold, and by W. A. Griswold to J. W. Hudson and by J. W. Hudson to the New York and New Orleans Coal & Iron Co., embracing about 2,500 acres of land.''

The complainants rely, first, upon said grant No. 4937, to which they deraign title insisting that it relates back to a special entry, and therefore, that if it overlaps upon grant No. 4935, to which defendants' claim of title is deraigned, it is superior thereto as a source of title: second, upon the lack of such overlap; and third; upon adverse possession by W. A. Griswold of said tract of land, especially of any interlap between the two grants.

The defendants deny that the complainants have any title superior to theirs. They deraign their title to grant No. 4935, issued by the State of Tennessee, on January 6, 1837, to Samuel Edmundson, based on entry No. 4328, dated December 7, 1836, in the name of Elisha Anderson. They insist that this is the

older and superior grant, as it relates back to an older entry; and that entry number 4355 upon which the other grant is based is not special. Defendants also plead and rely upon adverse possession for more than seven years, under registered assurance of title, of any interlap that may exist between the two grants—averring also that the possessions under which complainants claim were abandoned if they ever did cover the land herein involved. Defendants deny that complainants have a valid claim of title, without reference to the title of defendants. They also deny that grant No. 4937 overlaps upon grant No. 4935 because of certain words of exclusion in grant No. 4937. They insist that even if this is not true, they have the superior title to any interlap. They deny that the possession of Griswold, under which complainants claim, included any land within the boundaries of grant No. 4935. The record is voluminous, including conflicting maps and testimony of surveyors contradicting each other.

The Chancellor held that entry No. 4355 is not special and therefore, that grant No. 4937, upon which it is based, is not the superior source of title; that the complainants had not carried the burden of proof as to the location and possession of the lands; that there is an interlap because the southwest corner of grant No. 4935 is at a certain pine tree as claimed by defendants, and therefore, their deeds cover and embrace the land in question; that the possession by Griswold inside of the "pasture field" is not shown by that clear and positive proof that is required to establish adverse possession. All of the issues are presented by appropriate assignments of error and will be treated fully but not seriatim.

Grants Nos. 4935 and 4937 were issued on the same day; but, as entry No. 4328, upon the defendants' grant is based, is the older entry, complainants seek to apply the rule that a grant based on a younger entry that is special takes priority over a grant based on an older entry that is vague. This requires a determination whether or not entry No. 4355 is a special entry. This entry is as follows:

> "Stephen M. Griswold enters five thousand acres of land in Grundy county, Tennessee, on the headwaters of Collins River, beginning on a black oak standing on the bluff of Piney Creek, and on the old Indian Trace; running southward by crossing the Jasper Road; thence, eastwardly, then northwardly; thence westwardly to the beginning, including the piney thicket and mill seat, platting out all valid entries within said bounds."

In McEwen v. Coal & Land Co., 125 Tenn., 703, it was said that an entry, to be special, must in some part of it contain a reference to some thing or natural mark from which, either singly or together, the land can be ascertained with reasonable industry by these ac-

quainted in its neighborhood; that it must be special in its description, and if it is defective to this respect, it cannot be aided by extrinsic proof—citing Barnet v. Russell, 2 Tenn., 20; Barnes v. Sellers, 2 Sneed, 33; Berry v. Wagner, 5 Lea, 564. It was said that one of the chief objects of specialty in entries is to notify subsequent enterers of the locality appropriated by the first entry.

In Simms v. Dickson, 3 Tenn., 140, it was said that a special entry is one which so describes the objects for which it calls as to afford a subsequent locator a reasonable opportunity of finding the land located.

In McEwen v. Coal & Land Co., supra, an entry was held not to be special which described the land as ''on Cumberland Mountain, on the headwaters of Collins River, beginning on a black oak standing on the bluff of the right hand fork of Collins River; then meandering said bluff eastwardly crossing Little Laurel, thence northwardly; thence westwardly; thence southwardly to the beginning, platting out all prior claims.''

In Barnes v. Sellers, 2 Sneed, 35, an entry was held not to be special, the descriptive words being as follows:

''Beginning at a beech tree on the county line south of Baines Branch, running east, thence north and west for complement.''

The defect was the uncertainty as to location of the beech tree, the point where it was located not being indicated with sufficient certainty. The call for a tree not designated by some mark or description is in itself indefinite, unless perhaps, it were made to appear that there was no other tree, or trees, of same kind in the locality, clearly pointed out by other calls. The entry not designating the land to be appropriated with the requisite certainty was held to be vague and indefinite.

In Reid v. Dodson, 1 Tenn., 412, it was held that whether an entry be special or not depends upon the entry itself and cannot be made better or worse by parol proof of what the enterer intended; that it is a matter of law, not of evidence; that the ground of all proof respecting the calls of an entry must be laid in the entry; that the entry must show the place called for, and parol or other proof will be received to show that the place in its situation, name, etc., agrees with the calls of the entry; but where an entry is vague and uncertain proof cannot make it good.

If the evidence adduced would identify the objects mentioned in the entry so that by their very notoriety and distinctiveness the land could be identified according to the description in the entry, then it would be special. In such case, the entry would have to contain locative calls capable of being shown by proof to be so distinctive that a subsequent enterer would be bound to take notice

of the land described. A vague entry is one that contains no such special call that a majority of those acquainted in its neighborhood at its day could by reasonable industry find it; and special entry is the reverse. Smith v. Craig, 2 Tenn., 287.

Tested by the aforesaid rules we cannot conclude that the entry in question is a special entry. The old Indian Trace may have run for miles along the bluff of Piney Creek. There might have been hundreds of black oaks standing on this bluff and on the Indian Trace. Evidence might show that there was a black oak so located, but in order to make this entry special, it would have to be shown that there was only one black oak standing on the bluff of Piney Creek and on the old Indian Trace. Nor can the reference to the Piney thicket and mill site be considered as calling for objects that were notorious and distinctive. There might be many piney thickets and mill sites. In fact, this description might fit many tracts of land in that region. This entry is not special on its face and no proof has been adduced which would make it special. This is an indefinite entry; but it is insisted that the burden of the complainants claiming under it to show that the land can be located thereby is met by the official plat and survey which show the objects called for, and which are sufficient in the absence of evidence to the contrary to raise the presumption that such objects existed and were well known in the neighborhood. This insistence is based upon headnote 34 to the case of Southern Coal & Iron Co. v. Schwoon, 145 Tenn., 199. The text of the opinion in that case contains the following:

> "The plat and certificate of the survey constitute a public record, available, not as conclusive of the specialty of the entry, but where the plat shows the object called for as being located within the entry as called for, and the survey refers to the objects mentioned, the court will upon this · evidence presume the facts as stated by him to be true, and place the burden of disproving the specialty qualities of the entry upon the parties imposing it."

That was said with reference to an indefinite entry.

In McEwen v. Coal Co., 145 Tenn., 694, with reference to a vague entry, it was said, that an entry could not be made to possess the qualities of specialty by the survey. The foregoing excerpt from the Schwoon case is probably based on the holding in Wallen v. Campbell, 2 Tenn., 322, that the law presumes that entries standing indifferent as to specialty on their face, may be rendered as available by proof; that when the surveyor in his plat calls for the specialties of the entry it is presumptive evidence of the sufficiency of such evidence and consequently throws the onus probandi on the party opposing the validity of the entry. But the plat accompany-

ing the survey of the Griswold entry under consideration here, does not show any of the objects mentioned in the entry. Hence, the entry is not helped with reference to any specialty features by the survey. From the language above quoted from both cases, it seems that for this rule of evidence to apply it is necessary for the plat to show the objects.

In Southern Coal & Iron Co. v. Schwoon, supra, an entry, quite similar to the entry in question here, was held to be vague, it being as follows:

> "Hevelow Forester enters 100 acres of land in Warren county, Tennessee, on the Tarkiln branch waters of Collins River on Cumberland Mountains, beginning on a white oak near the path that Hill cut out on said mountain, and also near the bluff of the gulf, running thence southwardly, thence eastwardly for complement."

The Supreme Court held that this entry was vague and not susceptible of proof.

The next question presented is whether or not the complainants have shown a valid and regular chain of title from grant No. 4937 down to them. The conveyances attacked by the defendants are two tax deeds and a deed from the Clerk and Master. The first tax deed was executed on August 1, 1861, by S. J. Christian, tax collector, purporting to convey the land covered by grant No. 4937 to Stephen P. Tipton. The second tax deed was executed on December 19, 1861, by John Dugan, revenue collector, purporting to convey said land to Stephen P. Tipton. Testing these deeds by the statutes as to assessment of lands for taxation and sales of such lands for payment of taxes thereon when delinquent, in force at that time, we find that they contain all the essential elements of valid tax deeds, except that the second deed executed in 1861 recites that the judgment for satisfaction of which the land was sold was rendered by the circuit court in 1864. Section 627 of the Code of 1858 provided that to make the sale valid and communicate good title to the purchaser, it should be sufficient that the land lay in the county in which it had been reported for non-payment of the taxes thereon, and is sufficiently described; that it had been duly reported; that an order of sale had been awarded, and that the sale had been duly advertised. All of these requirements are clearly set forth in these deeds. The deeds recite the consideration paid; sufficient descriptions of the land; the judgments upon which the sales were made; the dates of the judgments and where rendered; the fact of legal notice having been given; the sales of the property and the dates thereof. After the lapse of over sixty years it is reasonable to presume that at least the first of these deeds was valid. We hold that it was a valid conveyance. Sheafer v. Mitchell, 109 Tenn., 181.

The incongruity of dates in the second deed might render it defective, although the date, 1864, might be a mere clerical error. As to this, we need not decide because both deeds were made to the same person and the first deed does not show any irregularity on its face. The second deed recites that the judgment and order of sale came into the hands of the sureties of the deceased collector of public revenue in the year 1858 and that they sold the land after giving the notice required by law; but the deed was executed by the successor in office of the deceased collector of the public revenue. The statute then in force provided that the collector should make the sale. It did not authorize the sureties of the collector to exercise any of the powers conferred upon the collector. Section 640 of the Code of 1858 authorized any of the successors of the collectors selling the land to make a deed to the purchaser.

However, as aforesaid, the deed of S. J. Christian, collector, conveying the same land, passed the title of Samuel Edmundson to this tract of five thousand acres.

Under Chapter 334 of the Acts of 1907, Shannon's Code, sec. 5572a2, we are bound to hold and construe the recitals of this deed as prima-facie evidence of the facts therein recited, in so far as such facts relate to the execution of the power of the officer executing the deed. Hill v. Moore, 121 Tenn., 182; Camp v. Riddle, 128 Tenn., 294.

It was therefore, not necessary for the complainants to support this deed by any certified copy of the record authorizing the sale of the land and the execution of the deed. The defendants undertook to show that this land was not properly assessed and sold for taxes, but the certificate of the county court clerk relating thereto does not identify this assessment on which the land was sold. It simply shows—"Samuel Edmundson, grant 5,000 acres." But, this might have referred to some other five-thousand-acre tract in the name of Samuel Edmundson, and there were several of that sort. These sales were in execution of judgments of the circuit court, a court of general jurisdiction, proceeding according to the course of the common law, and they are not subject to be impeached collaterally where a want of jurisdiction is not apparent upon the face of the record. Reinhardt v. Nealis, 101 Tenn., 169.

It is insisted that these tax deeds were illegally registered because they were acknowledged before the chairman of the county court, who had no authority to take acknowledgments. Both of them were registered in the year 1862. No distinction is made between a void acknowledgment and a defective acknowledgment, under section 3761 of Shannon's Code, in applying the presumption that a deed has been registered upon lawful authority where it has been registered twenty years or more. All inquiry upon the sub-

ject of probate is cut off. The presumption becomes absolute and conclusive after twenty years from date of registration. This is held in a long line of cases beginning with Mathewson v. Spencer, 3 Sneed, 513.

In Kobbe v. Land Co., 117 Tenn., 315, it was held that registration for twenty years cures an unauthorized, null and void probate; that the single fact of registration for twenty years protects the deed with absolute and indisputable verity.

The next conveyance was a deed of Sanders, Clark and Master, to S. M. Griswold, conveying this tract of five thousand acres by virtue of a decree of the chancery court of Grundy county at the March term, 1866, in a suit for partition among the heirs of Stephen P. Tipton. The deed recites the cause, the decree in which it was rendered ordering the sale, the fact of the sale at public outcry after advertisement, as required by law, the payment of the consideration by S. M. Griswold, and the authority to execute the deed. It was registered in 1889. It was acknowledged by the clerk and master before the President of the commissioners court of Grundy county. While there was no authority vested in such officer to take acknowledgments of instruments for registration, the same presumption under section 3761 of Shannon's Code is to be applied, as the instrument has been registered for more than twenty years prior to the filing of the bill in this cause. There is no evidence offered to impeach the recitals of this deed and therefore, under Shannon's Code, sec. 5572a2, the presumption that the clerk and master had the power to execute the deed is conclusive.

No further attack is made upon the chain of title of the complainants to whatever interest they derived under grant No. 4937 and the conveyances subsequent thereto. The assignment of error made by complainants as to the validity of their chain of title from grant No. 4937 is well taken, but this concludes merely the question of the regularity of their chain of title and is not decisive of the issues of this case. Although grant No. 4935, under which the defendants claim, being the older grant, is the superior source of title to any interlap between it and grant No. 4937, it must now be determined whether or not there is such interlap; for if not, the complainants must prevail and the issue as to possession is immaterial. Any possession relied on by either complainants or defendants must have been on an interlap on land common to both grants to be effective to toll the title. Wright v. Hurst, 122 Tenn., 670; Elliott v. Cumb. Coal & Coke Co., 109 Tenn., 745; Lumber and Coal Co. v. Bass, 136 Tenn., 696.

The solution of the question as to any interference between the two grants depends upon the location of the western boundary line of grant No. 4935, for the location of the eastern line of complain-

ant's grant No. 4937 is clearly shown to be a line running north and south, which they claim to be also the western line of grant No. 4935, and which is about 260 poles east of a line which the defendants claim to be the western line of said grant. It is true that defendants claim that partly within this disputed territory is a tract of three hundred acres entered by Wilson and Dial in 1826, by special entry, and therefore, excluded from grant No. 4937 by the clause, "platting out six hundred eighty acres of older title." Thus they seek to carry the burden of establishing the existence and location of the excluded land in claiming adversely to the grant and showing that as to such particular territory the grant never did operate as a conveyance of color of title to the excluded land. Iron & Coal Co. v. Schwoon, 124 Tenn., 209; Bowman v. Bowman, 3 Head., 48; Fowler v. Nixon, 7 Heisk., 719; Bleidorn v. Pilot Mountain C. & M. Co., 89 Tenn., 212, 15 S. W., 737; Wright v. Hurst, 122 Tenn., 656, 127 S. W., 701, 135 Am. St. Rep., 869. But this contention is immaterial and in vain if there is no interference between these two grants for then it would avail nothing to the defendants. If it were material, there is no evidence other than the entry and the grant that this was an exclusion referred to in the grant, so that the conclusion would be based upon a mere inference. This is not sufficient as carrying the burden. Complainants claim title to the land described in their bill (including this three hundred acres) through a deed of Stephen M. Griswold to W. A. Griswold, executed in 1869, and also a deed between the same parties conveying the three hundred acres and a tract of twenty-five acres, executed in 1867; and by adverse possession under these deeds, as will hereinafter appear. This possession was from 1869 to 1889, was open, obvious, notorious and continuous. It consisted of a residence, barn and a woodland pasture field enclosed by a rail fence. It existed for some years prior to 1869 largely upon that part of the whole tract covered by the three hundred-acre tract, but under color of title for only two years; in other words, from 1867 to 1869. Title by adverse possession thus had not been perfected to the three hundred-acre tract when the deed to the larger tract embracing it was executed. The rule that a continuation of possession of a smaller tract under a prior source or color of title would not be a possession under a later color of title to the larger tract embracing it, would not apply. Under that rule title by possession for seven years must be perfected in order that possession may be deemed to apply only to the smaller tract, so that an invasion of the larger tract outside of the smaller tract would be necessary. See, Smith v. Lea, 1 Cold., 549; Coal Creek Mining Co. v. Ross, 12 Lea, 9; Bon Air Coal Co. v. Parks, 94 Tenn. 270; Lumber & Coal Co. v. Bass, 136 Tenn., 696. The title of W. A. Griswold acquired by such ad-

verse possession extended to the boundaries of the tract conveyed to him in 1869 and passed through mesne conveyance to the complainants, excepting any part included within any interlap with grant No. 4935. The defendants in their answer disclaim title to any of the land except what they say is included within an interlap.

In the investigation of the issue as to an interlap, we have been partly aided by the testimony of surveyors and by maps prepared by them, but these are hopelessly in conflict. These we take into consideration together with parol evidence as to marked lines and corners, locations and natural objects, and various entries, surveys, grants and deeds to lands in the locality. We have prepared a map showing the locations of the various lines and corners contended for and we append it as a part of this opinion. This is an elaborate and complicated problem, but by adhering to well-settled rules of law and weighing carefully the conflicting evidence, we will endeavor to reach a correct solution. The object is, as aforesaid, to determine the true location of the western boundary line of grant No. 4935. The calls of this grant are as follows:

"Beginning on a hickory, the northeast corner of a survey of 5,000 acres in the name of Stephen M. Griswold, running north 920 poles to a gum; thence west 920 poles to a stake; then south 920 poles to a pine; then east with said Griswold's line 920 poles to the beginning, including and platting out 290 acres of older claim."

The "survey of 5,000 acres in the name of Stephen M. Griswold" lies immediately south of and adjoining grant No. 4935. It is known as grant No. 4934, dated January 6, 1837, based upon entry by Griswold, dated October 10, 1835. The calls of this grant are as follows:

"Beginning on the beginning corner of his, Griswold's one hundred [one thousand] acre survey, a pine on the Turpentine Branch, (No. of his entry 3165), running south, crossing Rains Creek at 560 poles, in all 908 poles, to a hickory; thence east 908 poles to a hickory, thence north crossing Eastley's Road at 260 poles, Rock House Fork of Falls Creek at 580 poles, in all 908 poles to a hickory; then west passing said Griswold's corner of his 720 acre survey by virtue of said entry No. 3165 and on with his line in all 908 poles to the beginning."

The location of grant No. 4935 depends upon the northern line and northern corners of grant No. 4934, for the beginning corner of grant No. 4935 is the northeast corner of grant No. 4934. The location of this corner is important, especially because the line running west from it will strike the beginning corner of grant No. 4934, a pine tree which is the key to the whole problem. It is to be determined by the true location of this pine. Complainants in-

sist that this pine stood on Turpentine Branch at a point 60 poles south of a point about 260 poles east of the place where stood a pine which defendants claim was the pine referred to, the southwest corner of a tract entered in 1836 by Stephen M. Griswold as 1,000 acres but surveyed to contain seven hundred twenty acres—by entry No. 3165. The location of this seven hundred twenty-acre tract is thus involved in this inquiry. The line from the northeast corner of grant No. 4934 to Turpentine Branch is shown to be of the length called for in the grant—908 poles—but in order to fix the pine claimed by the defendants as the northwest, or beginning corner, it is necessary to extend the north and south lines of both grants to about 1100 poles. Of course, this may be done if the pine tree relied on by defendants is the true beginning point, for, of course, calls for natural or permanent objects in an entry, survey or conveyance will control other and conflicting calls. When natural or artificial objects are called for as special and locative, then they control course and distance. Under this rule, when a call is manifestly false or mistaken, it must be rejected. Simms v. Baker, Cooke, 146; Whitside v. Singleton, Meigs, 207; Disney v. Coal Creek Co., 11 Lea, 611; Bleidorn v. Pilot Mountain C. & M. Co., 89 Tenn., 165.

The common corner of grant No. 4934 and grant No. 4935 on their western line is a pine. The common corner on their eastern line is a hickory. These are the two corners in dispute. Taking the point on Turpentine Branch as the beginning corner of grant No. 4934 as claimed by the complainants the evidence shows clearly that the calls fairly conform to the natural objects mentioned in the grant. From that point southward, according to all the witnesses, the line crosses Rains Creek at about 560 poles. From the pine corner relied on by defendants the distance to Rains Creek is 815 poles. At a distance of 919 poles from the first-named point on Turpentine Branch the surveyors found a hickory marked as a southwest corner, the marks being on the east side and the north side. Along this line they found some old marks as far as Rains Creek, but these may be the marks of the west line of the Gillie grant for 2.000 acres, which lies within the boundaries of grant No. 4934. From the southwest corner, the hickory, the line eastward was marked. From the southeast corner northward the line crosses the old Chattanooga Road at 260 poles. This is called in the grant the "Eastley Road." The line then crosses Rock House Creek at 577 poles, it being given in the grant as 580 poles. At a point 6 poles west of Fall Creek the surveyors found three marked lines coming together, as a corner, from the east, west and north. This point is 60 poles south and about 15 poles west from the other point claimed by the defendants as the northeast corner

of Grant No. 4934. From this point where the three lines come together the line running westward reaches the beginning point near Turpentine Creek at about the distance given in the grant. There is some doubt whether or not the marks on this line were made as marks of what are known as "Colony lots," laid off fifty or more years ago. We may look to adjoining grants as tending to show the boundaries of a grant in question—not that they may be considered as conclusive. Polk v. Robertson, 1 Tenn., 456.

The hickory, which was evidently the southeast corner of grant No. 4935 and the northeast corner of grant No. 4934, is designated in another grant to James Tate as its beginning point, a hickory on the bank of Fall Creek. This grant lies east of and adjoining grant No. 4934. It is also designated in entry No. 4347 by Meriday P. Tate as the beginning point of a tract of 5,000 acres described in said entry lying just east of grant No. 4935 and just north of the James Tate tract aforesaid. It is described in said entry as "a hickory on the bank of Fall Creek the beginning corner of a 5,000 acre entry claimed by Griswold, it being also the corner of another 5,000 acre tract surveyed for Griswold, running east 900 poles to a hickory, crossing Fall Creek at 6 poles." It is shown in the testimony to be a well known and established corner. From where this hickory stood, as claimed by defendants, the lines run north and west, and this would indicate the location of the eastern and southern boundaries of grant No. 4935. The line running east from the hickory corner claimed by complainants as the northeast corner of grant No. 4934 is a well-marked line. It is evidently the line between the two Tate grants. It reaches the natural objects mentioned in these grants at the distances therein given.

As to the true location of the western line of grant No. 4934 we may look to the recitals of a grant for 400 acres issued in 1841 to Henry T. Spong. The location of this tract is not in dispute. Its eastern line is the line claimed by the complainants as the western line of grant No. 4934. This Spong grant calls for the line of Griswold's 5,000 acre survey as its eastern line in two places.

From the hickory, the common corner of grants Nos. 4934 and 4935 on their eastern line, as fixed by complainants, there is a marked line running northward to a gum which is marked as a corner. From this tree westward the line is marked a part of the way. The testimony as to marks on the line running northward from the alleged corner on Turpentine Branch is so conflicting that we cannot reach a satisfactory conclusion. There is some testimony that it is a marked line. The line claimed by defendants as the western boundary of grant No. 4935 is well marked, but this is also the line of three other grants, two of them in part. There is no evidence that there are any marks on the line running

from the pine claimed by the defendants southward as the western line of grant No. 4934. There is testimony that there are no such marks. There is testimony that there are no marks along the south boundary line of grant No. 4935 as designated by the defendants; but if there are marks along this line they may be marks showing the south line of what is known as the Haight grant which runs along this line.

The line relied on by the complainants as the location of the "pine on Turpentine Branch" is but a few poles away from that stream. The pine corner claimed by defendants as the corner is on a level place on a ridge nearly half a mile from the main Turpentine Branch and at least 150 yards from the source of one of its small tributaries. It appears that water falling on the ground at this place might flow toward this tributary if in sufficient quantity to flow at all. It is to be noted that the recital is, "on Turpentine Branch," not "on the waters of Turpentine Branch," which would easily permit of a much greater distance of location.

In view of this evidence—the marked lines and corners, the calls conforming reasonably to natural objects, the recitals in contemporary grants to adjoining lands; comparing the calls in the grants with the natural objects on the ground; giving proper weight and due importance to the marks along the lines—we would readily conclude that the southwest corner of grant No. 4935, the northwest corner of grant No. 4934, and the southwest corner of entry No. 3165, the seven hundred twenty-acre tract, is the point claimed by the complainants. But we must consider carefully and dispose of the evidences relied on by the defendants to sustain their contention that the true corner is the pine which indisputably stood in the line claimed by them as the western boundary of grant No. 4935, near the forks of the Chattanooga and Colony roads. It is evident from the recitals in certain entries, grants and deeds that this pine was regarded by Stephen M. Griswold himself and others as the true southwest corner of grant No. 4935; and there is much parol testimony that it has long been so regarded. This evidence produces a sharp and almost irreconcilable conflict with the evidence for the other location. The conflict is, at least, a conflict between natural objects as to the true location. We do not undervalue the finding of the Court of Civil Appeals in the unreported case of Ellis Sparks et al. v. Sam Werner, September Term, 1912, opinion by Mr. Justice Hall, the writ of certiorari being later denied by the Supreme Court. The land in controversy in that cause is the land lying between the western line of the aforesaid Haight grant (claimed by defendants to be also the western line of grant No. 4935) and the line claimed by complainants in this cause as the western line of grant No. 4935. In that cause

the complainants deraigned title to the Haight grant. The defendants claiming under grant No. 4935 insisted that grant No. 4935, being the older grant, was the superior source of title. The complainants insisted that although this might be true, the western line of grant No. 4935 was only 920 poles from its eastern line, and they made the very insistence that is made in this case that the north and south lines of grant No. 4935 could not be extended to the line running north of the pine tree. Following a discussion of the issues herein involved the court found that the pine situated in the said forks of the roads was the same pine referred to in grant No. 4935 as its southwest corner; and that this being true, the northern and southern boundary lines of grant No. 4935 must be extended the necessary number of poles to reach this natural object called for in said grant, as well as the marked lines of said grant. But an examination of the opinion in that cause shows that the court did not have before it the facts hereinbefore recited as to the location of grant No. 4934. So that not only is this a suit between other and different parties, but it is presented upon a vast amount of other and additional facts. We therefore, deem it proper to consider and determine this issue independently of any former decision.

The proper explanation of defendants' contention is by reference to entry No. 3165 by S. M. Griswold for one thousand acres, dated October 2, 1836, and surveyed as seven hundred twenty acres —for the reason that certain other entries and certain grants call for the beginning corner of this entry as their beginning corners. This entry and the entries upon which grants Nos. 4934, 4935 and 4937 were based were surveyed by the same surveyor, A. Higginbotham.

The description in the survey of entry No. 3165 is as follows:

"Seven hundred and twenty acres of land, situated in said county on the waters of Collins River on Cumberland Mountain on a creek known as the Turpentine Branch near the Tar road, beginning on a pine tree and running north 240 poles to a pine; then east 480 poles to a hickory; then south 240 poles to a hickory; then west 480 poles to the beginning."

It is significant that the surveyor of these entries, in designating the pine, the beginning corner of entry No. 4041, upon which grant No. 4934 is based, and the beginning corner of entry No. 3165, designated it as a pine on Turpentine Branch. These entries were made and surveyed within a few weeks of each other. It is not likely that this surveyor, being familiar with these natural objects and lines, would create confusion in his descriptions. It is true that grant No. 5318 to Stephen Haight, dated June 30, 1837, designated as its beginning corner "a pine on the waters of Big Creek

of Collins River the beginning corner of a 1,000 acre entry in the name of Stephen M. Griswold, and running north crossing Big Creek;'' that this line of the Haight grant is conceded to be the line running north from the pine relied on by defendants. The entry upon which this grant is based is not in the record, nor is the survey; so that we do not know who surveyed this grant. It overlaps upon nearly all of grant No. 4935, and we presume that it was not surveyed by Higginbotham. This is the first reference to that pine as the corner of entry No. 3165 for seven hundred twenty acres. It is possible that in the Haight grant it was by mistake described as the beginning corner of that entry. After this time certain other grants and certain deeds described this line relied on by defendants as the beginning corner of entry No. 3165. It is so described in grant No. 10432 issued to Wiley P. Griswold in 1849 for 3,000 acres beginning at a hickory on the northeast side of the Altamont and Chattanooga road, running thence north 45 degrees east 12 poles to a pine, the beginning corner of a 1,000 acre entry in the name of Stephen M. Griswold. The eastern line of this grant is the western line of the Haight grant and it runs due north of the said pine. An entry of a tract of 445 acres by Stephen M. Griswold made in 1851 designated as its beginning point, a dead pine the beginning corner of Stephen M. Griswold's 1,000 acre survey, running thence south 45 degrees west 12 poles to a hickory, the beginning corner of Wiley P. Griswold's 3,000 acre survey. This was another designation of that pine as the southwest corner of entry No. 3165.

In 1853 Stephen M. Griswold conveyed to George E. Freeman this 445 acre tract, Grant No. 10,920, describing it as beginning on a dead pine, the beginning corner of Stephen M. Griswold's 1,000 acre survey, running thence south 45 degrees west 12 poles to a hickory, the beginning corner of Wiley P. Griswold's 3,000 acre survey.

In 1856 George E. Freeman conveyed to John H. Freeman a part of this tract describing it as beginning at a hickory, the beginning corner of an entry in the name of Wiley P. Griswold, running thence south 4 chains and 17 links to a stake in the Chattanooga road. This was the exact distance from the hickory to the road. But the Wiley P. Griswold 3,000 acre tract and the Stephen M. Griswold 445 acre tract were surveyed by a surveyor named William Armstrong. Nevertheless, Stephen M. Griswold, who entered the tract covered by grant No. 4934 accepted a description of his 445 acre tract containing a recital that the beginning corner of his entry No. 3165 was at this pine; and he made this same recital in his deed to George E. Freeman.

There is much parol evidence that for a great many years this pine relied on by defendants was regarded as the southwest corner of grant No. 4935; that even Stephen M. Griswold pointed it out as said corner. But it is very significant that there are no marks on the line running south of it; that taking that as the corner, the description of grant No. 4934 does not fit in with the natural objects called for in the said grant. If a call is for a natural object with a description of its location, and more than one place answers such description, the true place will be determined according to the calls which it answers. Den v. Ezel, 4 Hey, 162.

The safest way to ascertain boundaries is to compare the grants with the marks and natural objects on the ground. Payton v. Dixon, Peck, 148; Bowman v. Cox, Peck, 364; Funa v. Manning, 11 Humph., 313; Disney v. Mining & Mfg. Co., 11 Lea, 611. The law presumes an actual survey where a grant issues, and on trials in ejectment, the grant is conclusive evidence of the fact. Garner v. Norris, 1 Yerg., 62.

A line run according to course and distance may call for natural objects though called for as limiting objects, if such line is traced by the compass and actually marked and fixed by the survey as the boundary, and so proved. Massengill v. Broyles, 4 Humph., 205. The proper method for ascertaining the boundaries of a grant is to find if possible the lines which the surveyor surveyed on the ground. McNairy v. Hightower, 2 Tenn., 302. The rule is general that the boundaries of a grant as actually surveyed, are the limits of the grantee's right, and will control calls for the unascertained boundaries of an existing survey. Staub v. Hampton, 117 Tenn., 706. When the succeeding calls are as readily ascertained as the first, and are as little liable to mistake they are all equal with and controlled by the first. 9 C. J., 164 and cases cited.

In Funa v. Manning, 11 Humph., 311, it was said:

"The calls of a grant serve as a description of the land, by which we are able to ascertain its precise locality. If those calls harmonize, and all correspond with the objects on the ground, the description is perfect. But it often happens that mistakes occur, and that one or more of the calls of a grant, are repugnant to the other calls. When this shall occur, the dictate of common sense (and such is the rule of law), is to hold that directory calls, and calls for course and distance, yield to locative calls, and calls for natural objects and marked trees. The principle is, that the calls which are most certain, about which there is less probability of mistake or inaccuracy are to prevail. For as a great Judge has said, 'a grant shall not perish, if we can spell out its meaning.'"

Applying these principles to the foregoing facts, we must con-
clude that the designation of the corner of entry No. 3165 as 12
poles northeast of hickory, the beginning corner of the Wiley P.
Griswold 3,000-acre tract, in the later entries, grants and deeds, was
a mistake. To hold otherwise, would be to disregard the clear
and plain locations of the corners and lines of grant No. 4934 as ex-
pressed in the grant. The reference in said grant to the pine on
Turpentine Branch as its beginning corner as well as the beginning
corner of entry No. 3165 is in itself consistent. Although no pine
is shown to stand at that corner, it is easily possible that one
stood there nearly ninety years ago when these entries were made.
The pine is a common growth in that region. We are, therefore, of
the opinion and so find that the beginning corner of grant No. 4934
and the southwest corner of grant No. 4935 is at that point on or
near Turpentine Branch contended for by the complainants and
there is no interlap between grant No. 4937 and grant No. 4935.

In order to dispose of all of the assignments of error, we must
determine the question of title. by adverse possession by W. A.
Griswold of the land constituting what would have been the inter-
lap if the contention of the defendants had been sustained. This
depends upon the extent eastwardly of a certain pasture lot around
the house of Griswold and along the Chattanooga road. About the
year 1861, W. A. Griswold built and occupied a house east of the
road and west of the supposed interlap. He lived there until 1889
when he sold to J. W. Hudson the tract described in the bill in this
cause, which was conveyed to him by Stephen M. Griswold in 1869.
In 1867 W. A. Griswold acquired by deed from Stephen M. Griswold
and Ramsey two tracts within this larger tract, being for twenty-
five acres and three hundred acres respectively, which had been
entered and surveyed for Wilson and Dial in 1826, but no grant
therefor was issued. As hereinbefore determined, W. A. Griswold,
acquired title to these lands under these deeds and held possession
under the same as color of title. The only question is whether
or not the pasture lot extended over beyond the supposed west line
of grant No. 4935 and upon the supposed interlap. It is true that
in the deed of Griswold to Hudson in 1889, relied on as a link in
complainants' chain of title, the grantor retained the surface right
in five hundred acres reciting that it was to include his home place
and all the improvements thereon, and that there is no record of
any conveyance by W. A. Griswold of this five hundred acres so as.
to pass the title down to complainants. One witness for complain-
ants testified that this tract so reserved did not go beyond the sup-
posed west boundary line of grant No. 4935. But this question is
not material for the reason that Griswold had already perfected
his title by possession to the land outside of the five hundred acres
Vol. III T. A.—34.

and his deed had passed title to all but the land reserved; and therefore, the same proposition is before us, that if the pasture field extended over on the supposed interlap, his deed passed title to the interlap unless the title so acquired by adverse possession was later destroyed by the adverse possession under which the defendants claim.

The burden is upon the complainants to show the character, location and extent of the possession relied upon by them. Dyche v. Gass, 3 Yerg., 397; Iron Co. v. Lawson, 35 S. W., 456; Fuller v. Jackson, 62 S. W., 274; Irvine v. McRee, 2 Humph., 554.

One seeking to show title by adverse possession has the burden to make out by clear, strong and positive testimony such adverse possession as will bar the real title. Coal Co. v. Coppinger, 95 Tenn., 526; Jones v. Coal Creek Min. Co., 133 Tenn., 183.

Sometime after W. A. Griswold built his house, he built a rail fence enclosing the woods east and southeast of his house, running on its southwestern side along the Tracy City road. It enclosed a tract variously estimated in this record to comprise from twenty to one hundred acres. There is some evidence that this enclosure was made first before the Civil War; that it was burned and rebuilt in 1868; that two or three years thereafter, it was burned again. Griswold's son testifies that it was rebuilt in 1872 and remained an enclosure for the pasturage of stock for twenty-five or thirty-five years. Witnesses, who have always lived in the neighborhood, testified that many times it was broken in places, showing gaps, and remained so for considerable time. The enclosure was used as a pasture but never cleared. The fence was destroyed by fire twenty-five or thirty years ago and never rebuilt; but the proof does not show that whatever title was acquired under it was abandoned. See Hornsby v. Davis (Chy. App.), 36 S. W., 163.

In order to place any part of this pasture within the interlap, it would be necessary to demonstrate that it extended eastwardly nearly to the point where the old Griswold mill road came into the old Turpentine road. It is evident that the fence came southeastwardly as far as the forks of the Tracy City road, and the old Turpentine road. Norman Griswold, a son of W. A. Griswold, says that from this point it extended along the Turpentine road about 75 yards, then turned northwardly and went around the enclosure. This would hardly place the pasture over on the interlap. Another witness, Mr. John Scruggs, an aged man, says that it extended east on the Colony road about a half mile. No other witness has such a recollection. The Colony road leads off from the Tracy City road at a point northwest of the junction with the Turpentine road and runs mainly south of the Turpentine road.

John McClure and B. C. Grayson, the surveyors, placed the eastern line of the fence over on the interlap. Grayson's testimony is largely hearsay. He found some old rails lying on the ground but he does not say that any of them were on the interlap. Mr. J. M. Givens knew the place well while the fence was standing, and while he approved the map made by Grayson, he does not definitely say that the fence extended over on the interlap. A. C. Alexander, the clerk and master, and a surveyor, says that Grayson placed the pasture field too far south. He says that possibly five to eight acres of the field are within the interlap, but finally admits that this is mere guess work. J. W. Lockhart, an aged man who knew the fence well, having worked for Griswold, testified that to the best of his recollection, the fence did not extend as far as the Turpentine road. McClure does not point out the line further than to approve the map made by Grayson. Scott Fults says that it was 400 or 500 yards from the forks of the Tracy City and Turpentine roads to where the fence extended; that there is no sign of this old fence to be seen anywhere along the old Turpentine road. Andrew Fults testifies that it was 315 steps from the Turpentine road along the Griswold mill road to where the northeast corner of the fence stood. This would indicate that that corner was west of the interlap. These two witnesses have lived in that neighborhood all of their lives.

In view of the conflicting nature of this testimony and the doubts raised as to the certainty of knowledge on the part of complainants' witnesses as to the exact location; in view of the strictness of the rule that one claiming title by adverse possession must show such possession by clear and strong and convincing evidence; we must conclude that the Chancellor was correct in holding that the complainants had not carried the burden sufficiently to prevail over the defendants.

The defendants claim title to the supposed interlap, not only by superior record title, but also by adverse possession. As we understand their proposition, it is that even if the complainants acquired title by adverse possession, that title has been destroyed by adverse possession on the part of defendants or those whom they derived title. It is true, that like any other title, a title acquired by adverse possession may be tolled by adverse possession. 2 C. J., 255.

In the year 1882 Frederick Schwoon, Sr., through whom defendants claim by devise, purchased the land covered by grant No. 4935 with the exception of certain tracts therein which had been sold or were covered by older entries. Within the interlap in question he had three houses—(1) the Sparks house built in 1907 in a cleared tract of five or six acres. The house was kept locked

continuously and open and continuous ownership or possession was exercised for about ten years; (2) The Counts or Werner house. This was a log house and barn surrounded by rail fence and maintained from 1907 to 1920; (3) a wire fence enclosure of about one acre south of these possessions. On this a house was erected about 1909 and stood for about two years when it was burned. In August or September, 1914, a wire fence attached to trees was placed around the enclosure. Little, if any of it, was cleared but a part of it was plowed and sown in oats one year and another in turnips. It seems to have been vacant for a period of two or three years. The date of the placing of the wire fence is taken according to the testimony of the witness, who says that he erected it at the time mentioned.

The evidence shows that the Sparks and Counts possessions were upon a tract of about one hundred twenty-seven acres, known as the Saunders Dykes tract within the boundaries of grant No. 4935. Saunders Dykes acquired this tract under two deeds in 1856. Frederick Schwoon, Sr., purchased it by deed on June 8, 1914. The possessions on this smaller tract must be deemed to have operated only to the limits thereof, although Schwoon already had color of title to the larger tract surrounding it. This could not be taken as any evidence of intent to claim title to the boundaries of the larger tract. For this purpose it would be necessary to maintain possession upon the larger tract outside of the smaller tract. The actual possession of one tract of land is not a sufficiently open and notorious possession of an adjoining tract, which is not acquired, to give the owner notice of the adverse claim thereto. This is the same principle applied where title to the larger tract was acquired after the acquisition of title to a smaller tract within it, upon which possession had been held. We must presume that the possessions upon the Dykes tract were solely under the deed of 1914 as color of title and extended only to the limits of the Dykes tract. Smith v. Lee, 1 Cold., 351; Bleidorn v. Pilot Mountain Co., 89 Tenn. 166, 15 S. W., 737; Sullivan v. Davidson (Chy. App.), 43 S. W., 42.

We are of the opinion that defendants' title to the Dykes tract, so far as it overlaps upon the land described in the bill, must prevail over that of complainants. This title was perfected by adverse possession of Schwoon and his predecessors in title for the requisite period of seven years under color of title; but it extends no further than the boundaries of the said Dykes tract. We are further of the opinion that the possession of the lot enclosed by wire fence by defendants, outside the Dykes tract but within the supposed interlap, has not been sufficiently substantial and continuous to toll the title. It is not only not clear that there has been an open and

Piney Creek

ALTAMONT

Griswold Mill Road

Big Creek

South Line W.P.Griswold
3000 A. Tr.

25 Acre Tract

300 Acre Tract

Line Claimed by Complts

Pasture Lot

By Defts

Colony Line

Pine B.W.cor. Entry 31651

Hickory beg. cor. 3000 A.

Turpentine

Gra

Grant No 4937
Within these dotted lines

445 Acre
Tract

Tracy City Road

Dotted Lines claimed by complts
as the true lines

Diagonal Lines indicate
Interlap claimed

Solid Lines Claimed
By Defts

Spong
Tract

Woodlee
Tract

Woodlee
Tract

Sho

4099 Poles

Gum

Gum

3145
4934

Hickory
N.E.Cor. Gr
4934

Creek

Fq1

N

PLAT
ands in question .

notorious physical possession, but also, not clear that it has been continuous for the period of seven years prior to June 15, 1921, the date of the filing of the bill in this cause. It is rather of the nature of an illusory possession like that described in Daniel v. Coal & Iron Co., 132 Tenn., 509. The evidence indicates that between the burning of the house and the erection of the fence so much time elapsed that it could not be considered as a mere temporary break in possession which would not destroy the continuity thereof.

In view of all of the foregoing facts and the rules applicable thereto, we are of the opinion that the Chancellor was in error in dismissing the bill and his decree is reversed except as to the Dykes tract in so far as it boundaries conflict with the boundaries of the land described in the bill; and as to said tract only, the bill is dismissed. A decree to that effect will be entered sustaining the bill and to that extent. The costs of this appeal, as well as the costs in the court below, will be adjudged against the defendants. The cause will be remanded to the chancery court of Grundy county for further proceedings not inconsistent with this opinion.

## ON PETITION TO RE-HEAR.

DeWITT, J. In our former opinion we endeavored very fully to discuss and dispose of all the issues in this cause, but a very earnest and extensive petition to re-hear has been filed. We are asked repeatedly in this petition to examine and consider the records in other cases in which the location of the western boundary line of grant number 4935 was involved. Much of the petition deals with testimony said to be contained in these records. None of these records were made a part of the record in this cause in the chancery court. Of course, we cannot look to any of them, as this would be an exercise of original jurisdiction, which is not possessed by the appellate court.

In Shelby County v. Bickford, 102 Tenn., 395, it was held that records of other causes, even when used as evidence on a hearing of a chancery case, cannot be considered by the appellate court, though copied into the transcript, in the absence of a bill of exceptions, decree or other sufficient action to indicate that they were so used in the lower court. Citing Railroad v. Foster, 88 Tenn., 671; Marble Company v. Black, 89 Tenn., 121. Much less could the appellate court consider such records when in no way does it appear that they were used in the lower court. We have hitherto considered this cause on the record herein and must continue to do so. Nor can we consider any statements made by counsel in the petition or brief as to what facts he knows, which are not shown in the record.

It is insisted that the rule of stare decisis should be applied inasmuch as the Supreme Court has in several cases fixed the western line of grant number 4935 as contended for by appellees; that the court should be greatly indisposed in an independent litigation to re-open the question as to the location of the boundary line. According to the weight of authority, a title previously passed upon, although in a suit between other parties, will not be again examined and adjudicated in a case proceeding upon the same state of facts and presenting precisely the same question, in the absence of a showing that the former decision was manifestly erroneous. 2 Black on Judgments, sec. 603; Iron Company v. Railroad, 131 Tenn., 229. But we have no judicial method of ascertaining whether or not the case before us proceeds upon the state of facts presented in the former cases.

In Iron Company v. Railroad, supra, in which the indisposition of the court to re-open a question of title was manifest, the question involved was really a question of law, as it was the specialty of an entry. Here we have a question of fact as to the location of a boundary line.

In our former opinion we referred to the opinion of Mr. Justice Hall, then of the Court of Civil Appeals, in the case of Ellis Sparks et al. v. Sam Werner, as showing that in that case the court did not have before it the facts contained in this record as to the location of grant number 4934. We did not examine the record in that cause as it was not a part of the record in this cause, having not been heard or considered by the Chancellor. The opinion itself shows that it is not based upon such facts as are shown in this record.

Without reciting and discussing again the facts set forth in our former opinion, we will set forth additional facts herein testified to, and will discuss the contentions made in the petition to re-hear.

The appellees attach to their petition what purports to be a copy of entry number 4448 by William Hale, on which the grant to Haight is based. This entry is not in the record and cannot be considered. It is insisted that it is in the office of the land commissioner and is a public record; but the court cannot take judicial notice of such records.

The appellees in their petition reiterate the recitals in the Wiley P. Griswold grant, the Haight grant, and various deeds as to the location of the beginning corner of entry number 3165, the seven hundred twenty-acre tract, which is the key to this problem. But they ignore the fact that A. Higginbotham surveyed grants nos. 4934, 4935 and 4937, and we have held that it is not to be presumed that the same surveyor would survey these tracts so as to cause an interlap. It is argued that S. M. Griswold entered the seven hun-

drẹd twenty-acre tract, also grant number 4937, and other tracts, locating the beginning corner of entry number 3165 at the pine claimed by the appellees; that the Wiley P. Griswold grant recites this pine as the beginning corner of entry number 3165; that S. M. Griswold was a chain carrier on the survey of grant number 4935; and that he could not have been mistaken as to the pine which was the beginning corner of grant number 4934, on which grant number 4935 is based for description. We have hitherto set forth the reasons for our conclusion that the fixing of the pine contended for by appellees as the beginning corner of the seven hundred twenty acre tract was a mistake, and in this we took all of these facts into consideration. We held that to hold otherwise would be to disregard the clear and plain location of the corners and lines of grant number 4934 as expressed in the grant and as fitting the marked lines and natural objects. We took the recitals of grant number 4934 as the basis and endeavored to apply to them the facts according to the preponderance of the evidence. We laid emphasis upon the recital in the grant, of the beginning as "a pine on Turpentine Branch" the beginning corner of entry number 3165. It is insisted that this may mean, "on the waters of Turpentine Branch," and that this would apply to the well-known pine contended for by the appellees, which was situated nearly four thousand feet from the place at or very near Turpentine Branch and which the appellants contend was the true corner. It is also insisted that because the record does not show that any pine stood at this latter place, it could not be considered as the beginning point. We know of no warrant in law for such an interpretation. The grant itself fixes the location of the land "on the headwaters of Collins River." When it specifies the beginning point it designates it as a pine on Turpentine Branch. The word "on," when used in a description of boundaries, is always to be understood as a term of exclusion unless there is something in connection which makes it manifest that it is used in a different sense. 9 C. J., 153.

In Talbot v. McGavock, 1 Yerg., 263, the entry or preemption called for the corner to be "on a dry branch leading to the dry pond." The tree mentioned as the corner was found to be on a small branch about forty poles from the mentioned dry branch and emptying into it. This was held to be a special entry. The question there was merely that of identity of the small branch with the large branch. Both were dry branches. The tree was on the small branch, not some distance away from it. It is unreasonable to think that the surveyor would designate a tree nearly four thousand feet away as being on Turpentine Branch. It is true that it was much nearer to a small tributary of Turpentine Branch, but it was on a ridge about a quarter of a mile from the very source of

the small tributary. It is true that no pine is shown ever to have stood at the precise point on Turpentine Branch insisted upon by appellants, but we cannot conclude that no pine stood there in 1837. If the pine insisted upon by appellees was not the true corner of the seven hundred twenty-acre tract and therefore of great number 4934, the recitals relied upon as conclusive were either made by mistake or by design. It is very difficult to conceive of a competent surveyor running the north and south lines of grant number 4935 about eleven hundred poles long and then describing them as nine hundred twenty poles long. It is significant that when he came to convey grant number 4935 to Frederick Schwoon, Sr., in 1882, Moffitt, the executor of Hill, gave the distance of these lines as only nine hundred eight poles, and this was exactly the length of the north line of grant number 4934 as recited in the grant.

We have not overlooked the testimony in the record that certain old residents of the neighborhood pointed out the pine, insisted upon by appellees, as the corner of grant number 4935. Such hearsay testimony is admissible when the statements were made while no litigation was pending concerning the land; it is evident that this information is finally traceable to S. M. Griswold. It is, therefore, of no greater value than what he said and did concerning this location.

The appellees began all their surveys with the known pine insisted upon by them. They relied upon their right to do this because of the recitals in the entries and grants aforesaid. They did not show any marked line running southward from this pine nor any hickory corner at the end of said line. They can only account for the reference to crossing of Rains Creek at 560 poles as a mistake. Such a conclusion can only be arrived at on the basis of other elements making it virtually impossible. It is not reasonable to think that Higginbotham would designate a distance as five hundred sixty poles, when in fact it was eight hundred fifteen poles, that being the distance to Rains Creek from the pine insisted upon by appellees. The difference is too great to be accounted for on the ground of mere mistake. The appellees insist that if the seven-hundred-twenty-acre tract were located as found in our former opinion, it would be described as on the water of Rains Creek, which flows through it, instead of on a creek known as the Turpentine Branch, near the tar road; but in either location Turpentine Branch would flow through this seven-hundred-twenty-acre tract, and the Tar Road would also go through a considerable part of it.

It is insisted that to locate the southwest corner of grant number 4935 according to the appellants' contention would be to lessen the area of the tract as called for in the grant, to such an extent that it

would be a calamity. This would be unfortunate but it would not control. What we have endeavored to do was to ascertain the location of the lines and corners as fixed by the surveyor on the ground. If the contention of the appellees were sustained the northern and southern lines of grant 4935 would be 1099 poles, when their deed calls for 908 poles; and this difference is greater than any loss due to upholding the contention of the appellants.

The record in this cause discloses several surveys made by the surveyors who testified. Counsel for the appellees has in their petition given much space to the discussion of the earlier surveys and depositions based thereon. It appears that four surveyors together made a re-survey of the land in controversy. All of them thereafter testified. Three of them, Grayson, Clendennon and Robinson, represented the appellants. The other, Alexander, represented the appellees. As the Spong grant calls for the Griswold tract of 5,000 acres (grant number 4934) as its eastern line, these surveyors started with the southwest corner of the Woodlee tract, as the southeast corner of this tract is the beginning corner of the Spong tract as recited in the grant. No question is made as to the location of the Woodlee tract. They found the south line of this tract marked. From the southeast corner of this tract they ran east 72 poles, as recited in the Spong grant. The next call in the Spong grant, is "then north with Griswold's 5,000 acre survey 88 poles to pointers." The next call is, "then west with Daniel Fult's survey 45 poles to white oak." Mr. Alexander testifies that the said distance of 88 poles is too short; nevertheless, the location of the Fults tract is not in dispute. Alexander testifies that the distance of 72 poles from the southeast corner of the Woodlee tract would reach a point about 20 poles east of the western line of grant number 4934 as contended for by the appellants; but it is evident whether the distance is 72 poles or not, the southeast corner of the Spong grant was intended to be at a point in a line which is an extension of the west boundary line of grant number 4934. The surveyors found in that line a hickory marked as a corner with two very old hacks. They reversed the call by going northward to Turpentine Branch. From a point very near Turpentine Branch they ran southward and crossed Rains Creek at 558½ poles. Mr. Alexander said that he found no marks along this line, but the other surveyors testified that they found trees marked with two very old hacks at points along this line from the Fults tract, up to and within a few feet of Turpentine Branch. The rule as to the prevalence of positive testimony over negative testimony would seem to govern this conflict. It is insisted that these marks are marks of what are known as the line of the Colony lots. There are frequent references to the Colony lots but this record does not show

what the colony lots were. On the other hand the evidence is that the colony marks are three marks instead of two.

Appellees contend that because the southeast corner of the Spong grant at 72 poles east of the corner of the Woodlee grant would place the west boundary line of 4934 twenty poles east of where it is located by the appellants, the calls for the Griswold line in the Spong grant are too unreliable to be considered; but the call for the eastern line of the Spong grant running from its southeastern corner is the Griswold line wherever that may be. If there was such a line the Spong grant would follow it whatever might be the distance along its southern line.

In the line south of the Fults tract the surveyors found the hickory marked as aforesaid and from this point eastward the line was marked to what is known as the Pickett field. This is agreed to by all of the surveyors. They agreed as to the southeast corner of grant number 4934. In our former opinion we have shown that the line running northward from this corner fits the road and the creek at the distance respectively prescribed. In their last depositions Alexander and Grayson agreed on the location of the northeast corner of grant No. 4934; that is, Alexander said that Grayson's last map showing the eastern line and the northeast corner is correct. The last survey followed the marked line instead of the complement of poles, and this led the surveyors to the point six poles west of Fall Creek from which the lines run in four cardinal directions. In the interpretation of this record we consider primarily the last survey and the testimony based thereon. Much is said as to the previous testimony given by these witnesses, but we think that the last survey and the testimony based thereon furnish clearer evidence of the true locations. We have hitherto described the two Tate grants lying east of grants nos. 4934 and 4935; and we have called attention to the fact that there is a marked line running eastward separating these two Tate grants, beginning at the point agreed upon as the northeast corner of grant No. 4934. It is impossible to ignore this fact because the Tate grants are based on this as the beginning corner.

If the west boundary line of grant no. 4934 is the line contended for by the appellees, grant No. 4934 would include the Spong and Woodlee tracts. The Spong tract was granted in 1841. The entry upon which it is based is not shown in the record. It was dated September 23, 1839.

Another basis for our conclusion as to the location of the beginning corner of entry 3165 and grant No. 4934 is as follows:

The east boundary line of grant No. 4937 (surveyed by Higginbotham) is undisputed. The recitals in this grant do not call for any lines or corners of entry 3165 or grants 4934 or 4935. And yet

the east boundary line of grant 4937 runs right through the point on Turpentine Branch insisted upon by the appellants as the beginning corner of grant 4934. This cannot be a mere coincidence. Again, the call in the Spong grant for the west boundary line of grant 4934 refers to a line which is this east boundary of grant 4937 extended southward. The call in the Spong grant for this line and the call in grant 4934 showing this line as crossing Rains Creek at 560 poles are consistent with each other, although they are in different instruments. The call in the Spong grant for the Griswold line (grant 4934) locates the Griswold line as this east boundary line of grant 4937 extended southward. This call in the Spong grant, the distance to Rains Creek given in grant 4934, and the undisputed location of the east boundary line of grant 4937 are facts shown independently of each other, and they are consistent.

The testimony of the appellants' surveyors is that from the point on Turpentine Branch, which they claim is the true corner, eastward to the point six poles from Fall Creek, the other corner, there is a line marked by two sets of marks—one being two hacks and the other three hacks. The two hack marks are very old. Some of them are so decayed that the age cannot be counted. This is not denied by Mr. Alexander, nor by any other witness. These series of two hacks cannot be marks of the colony lots. It is insisted that the marked line running north from the northeast corner of grant no. 4934 is a line of the colony lots. As we have said, the record does not show the location of these lots by any map or instrument. The testimony of Clendennon and Grayson is that these marks are in two sets, the older marks being two hacks. It is further insisted that the marks running west from this corner are marks of Nusbaum's tract, supposedly a colony lot. This is met by testimony that this line runs about the middle of the colony lots. Robinson testifies that the gum relied upon by appellees as the northeast corner of grant No. 4935 is not marked as a corner. We do not find any testimony showing that it is so marked. We are not primarily concerned with the length of the east boundary line of grant No. 4935, but we are compelled to take into account this evidence as to marks along the line and the marks on the other gum showing that it is a corner. If it is the corner of colony lots instead of grant No. 4935, the record does not show it.

It is insisted that the court is in error in holding that if there were an interlap, a possession had to be on the interlap because a younger grant line cannot restrict the possession on an older grant, but the older grant, wherever located, extends to its boundaries regardless of younger grant lines and interferences of younger grants.

The case of Elliott v. Cumberland Coal & Coke Company, 109 Tenn., 749, is cited as authority for this position. We are of the opinion that this case is the authority for the contrary position as set forth in our original opinion; nor is the case of Ernest v. Little River Land & Lumber Co., 109 Tenn., 427, in conflict with the holding of this court.

It is insisted that the court was in error in finding that the possessions of the appellees, known as the Sparks and Counts possessions, were inside of the Dykes tract. We have only to say that this finding of the court was predicated upon admission to this effect by the defendant Schwoon on his cross-examination.

We adhere to our finding that the ''wire lot'' possession was in the nature of an illusory possession, and that the record did not show it had been maintained for the requisite period prior to the filing of the bill. We examined this question of fact very carefully and discussed it rather minutely in our original opinion.

This case has received the most careful and painstaking consideration of all the members of this court. It is complicated and we have endeavored to find the facts according to the preponderance of the evidence in the record before us, not in any other records. We have been guided by well known rules and principles long ago laid down, and we have no disposition to depart from them. While we do not know what facts were presented by other records in cases involving the location of these lines, we suppose that those records did not present all the facts which have been set forth as in this cause. We have given to this case our most earnest and thorough consideration and we see no valid grounds upon which we should depart from the conclusions which we have already reached and set forth in our former opinion.

For these reasons the petition to re-hear is overruled at the cost of the petitioners.

Faw, P. J., and Crownover, J., concur.